(278 P.3d 975)
No. 105,008

STATE OF KANSAS, *Appellee*, v. ROBERT L. BELLINGER, *Appellant*.

Opinion filed June 22, 2012.

*Barry A. Clark*, of Clark & Kellstrom, Chtd., of Manhattan, for appellant.

*Sherri Schuck*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MARQUARDT, J., and BRAZIL, S.J.

MARQUARDT, J.: Robert Lynn Bellinger (Robert) was convicted of aggravated assault and criminal threat. On appeal, Robert claims that the district court erred in denying his request for jury instructions on self-defense and defense of property. We affirm.

Brothers Robert and Michael Bellinger owned adjoining farms in Pottawatomie County, which they used primarily for grazing cattle. The brothers had a contentious history with each other. Prior to the incident that caused the filing of criminal charges against Robert, the brothers had a dispute because Katheryn Bellinger (Michael's ex-wife and current business partner) burned some of Robert's pasture. Another problem occurred when two of Robert's bulls and a cow wandered into Michael's pasture, and Michael put them in his catch pen.

At approximately noon on June 4, 2009, Michael, Katheryn, and their son, Matthew, drove to Robert's farm to retrieve Katheryn's grain truck that she had loaned to Robert. Michael testified that he did not want to talk with Robert, so he sent Matthew, who was able to get along with Robert, to find Robert to ask if they could get the truck. Michael and Katheryn waited in a truck on the public road until they were told that it was okay with Robert to get the truck. When Matthew located Robert, he asked if "we" could get the truck. Robert told Michael it was okay. According to Robert, he assumed that the "we" meant Matthew and Katheryn.

Matthew returned to Michael's truck and the three drove to Robert's hay shed, where the grain truck was stored. When Robert drove up to the hay shed on his tractor, he saw Michael and Katheryn sitting in their truck. Robert then proceeded to help Matthew move a piece of equipment that was blocking access to the grain truck.

After moving the piece of equipment, Robert walked up to the driver's side window of Michael's truck, where Michael was sitting. Up to that time, there had been no exchange of any kind that day between Robert and Michael. Robert testified that he initiated the contact with Michael when he said, "Why did you leave my cows in the catch pen?" Michael responded that Robert needed to keep his cattle out of Michael's pasture. On cross-examination, Michael was asked:

"Q. You agree that you told Bob if his cows got in your pasture again you were going to take them to the sale barn?

"A. Yeah, that is what you're supposed to do when your cattle or somebody else's cattle get in your pasture. By law you're supposed to get ahold of the Sheriff, or take them to the sale barn."

When Robert's cattle got into Michael's pasture, he put them in a catch pen. Michael testified that he tried to call Robert on his cell phone to tell him about the cattle, but Robert would not take the call, so he called the sheriff.

After Robert approached Michael, both brothers testified that the argument escalated from there. Michael testified that it turned into a "yelling match" until Robert walked away, said "I'll kill you," and got the rifle.

The following exchange took place when Robert was cross-examined:

"Q. Now, when you approached Mike — Let's go back to June 4th, and you know he's mad and you come up to the truck and you're talking to him about the cows. What did you think was going to happen when you guys started in and about the cows?

"A. I thought they would tell me why he did that.

"Q. Was there anything in your history that would lead you to believe that he would do that calmly?

"A. Well, no, but I hoped he would.

"Q. Okay. That's — but — okay.

"And then you go up to him and you — I think you tell me that the whole time you two are talking, he's yelling and cussing and you're talking with him calmly like you are now?

"A. He's not yelling to be yelling, he's belligerent and he was not yelling like standing up and screaming across the city street, but he's got a strong loud voice that he was using and it was similar to being belligerent.

"Q. And you would agree your brother does have a pretty booming voice; right?

"A. Yes.

"Q. And that's on a normal level?

"A. No. No. When he talks to people he's more quiet.

"Q. Okay. So then you're saying right now when you guys are discussing the cows, about taking them to the sale barn, shooting them, stabbing them, he was belligerent or not angry?

"A. He raised his voice then but he was angry. He wasn't mad. He was just angry.

"Q. Okay. But at some point you say — Okay.

"You testified on direct that he was so angry he was getting angrier, he's yelling at you, he says, 'I'll shoot the cows', and he says, 'Go get your gun,' and you felt that he was going to come out of that truck and all of a sudden you felt your personal safety was in jeopardy; isn't that what you testified to on direct; right?

"A. Yes.

"Q. Okay. But now you're saying, well, he wasn't mad, he was belligerent?

"A. As we were discussing the food [sic] of discussion he heated on up and at the end of the discussion he was ready to kill me. You could see that he had his jaw set and he was ready to come get me.

"Q. And yet he never got out of the truck; did he?

"A. I went and got —

"Q. Did he get out of the truck, Mr. Bellinger?

"A. No, sir. No, Ma'am.

"Q. In fact, you were able to turn away from him, walk over to this other truck — because you can't run apparently, so you walked over to the other truck and you had to pry the gun out, according to your testimony, and he never got out of the truck; did he?

"A. Because I left the truck. If I had stood there —

"Q. Did he get out of the truck?

"A. No."

Robert testified that he threatened to shoot or kill Michael, to which Michael responded, "Go ahead." Robert also testified that Michael told him, "Go get your gun."

Robert testified that Michael was belligerent, and he believed that Michael was "ready to come out of that cab and beat the hell out of [him]." Robert also testified that he thought that Michael might set his hay shed on fire, but there is no evidence to support this assertion. While Michael sat in the truck, Robert walked away and got the .22 caliber rifle that was on the floor of another truck parked nearby.

Robert came back to the truck where Michael remained, put the rifle within 26 to 28 inches from Michael's head, and ordered Mi-

chael to leave his property. Although Robert testified that he did not believe the rifle was loaded, he moved it slightly, in case he was wrong, then pulled the trigger. Robert testified that he wanted to scare Michael. The rifle fired. Miraculously, the bullet missed both Michael and Katheryn but shattered the back window of the truck cab. Katheryn and Michael testified that Robert fired the rifle within seconds after telling Michael to leave. Robert did not dispute this fact.

Robert was somewhat equivocal when asked whether he intended to fire the rifle. On direct examination, he testified he "touched" the trigger, but on cross-examination he testified that the rifle accidentally fired when he intended to pull the trigger to make it dry fire.

That caused Michael to get out of the truck and confront Robert. Although the details differed depending on who was giving the testimony, Michael was shot during the struggle. However, Michael did manage to take the rifle away from Robert and hit him at least once with the butt of the rifle. Matthew got between the two and stopped the fight. Then, Michael, Katheryn, and Matthew drove away.

Robert called 911 after the shooting. The Riley County Police Department dispatcher asked if the shooting was accidental, to which Robert replied, "No." Indeed, he repeatedly told the dispatcher, "I shot my brother." Robert later testified he was terrified and confused when he called to report the shooting. Also, while police drove Robert to the county jail, Robert commented, without being questioned, that he and Michael constantly argued and never got along.

The State filed a four-count information against Robert, alleging attempted premeditated murder against Michael, in violation of K.S.A. 21-3301 and 21-3401(a); aggravated battery against Michael, in violation of K.S.A. 21-3414(a)(1)(A); aggravated assault against Katheryn, in violation of K.S.A. 21-3410(a); and criminal threat against Michael, in violation of K.S.A. 21-3419(a)(1).

Robert requested jury instructions on self-defense and defense of property, both of which the trial court ultimately denied. On May 21, 2010, the jury convicted Robert of aggravated assault and

criminal threat but acquitted him on the other charges. The court granted Robert 24 months of probation, with underlying sentences of 12 months' and 6 months' incarceration, respectively, for the aggravated assault and criminal threat convictions. Robert timely appeals the district court's denial of his requested instructions.

### SELF-DEFENSE JURY INSTRUCTION

A defendant is entitled to instructions on the law applicable to his or her theory of defense if there is evidence to support the theory. *State v. Hendrix*, 289 Kan. 859, 861, 218 P.3d 40 (2009). However, there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational fact-finder finding in accordance with the defendant's theory. 289 Kan. at 861.

When the trial court refuses to give a requested instruction, an appellate court must review the evidence in the light most favorable to the party requesting the instruction. *State v. Ransom*, 288 Kan. 697, 713, 207 P.3d 208 (2009). In arguing that the trial court erred in denying his request for a self-defense instruction, Robert claimed that since the jury acquitted him of attempted first-degree murder, its lesser-included offenses, and aggravated battery, it demonstrates that the jury concluded he did not intend to shoot Michael.

K.S.A. 2010 Supp. 21-3211, the self-defense statute, was enacted to apply retroactively and so applies to this crime, see K.S.A. 2010 Supp. 21-3220, and it states:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and *such person reasonably* believes that such use of force is necessary to defend such person or a third person *against such other's imminent* use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is *necessary to prevent imminent death or great bodily harm* to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person." (Emphasis added.)

At trial, in discussing whether a self-defense jury instruction should be given, the court stated:

"As defense counsel candidly pointed out . . . [*Hendrix* requires] there has to be physical force applied by the defendant in defense of his person before he can claim a self defense, and the only time when it comes remotely close to an argument being made that physical force was applied [was] when there was a brief struggle over the firearm. And the Court's recollection is that there wasn't testimony from the defendant that he was applying force, trying to grab the gun away from Mr. Michael Bellinger."

When Robert learned of the passage of House Substitute for Senate Bill 381 (L. 2010, ch. 124), he argued in a posttrial motion that the revised legislation permits self-defense when threats of force are uttered and not only when actual force is used. House Substitute for Senate Bill 381 became effective on April 29, 2010, and states:

"(1) 'Use of force' means any or all of the following directed at or upon another person or thing: (A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another." L. 2010, ch. 124, sec. 2; K.S.A. 2010 Supp. 21-3221(a)(1).

Robert claims that under the revised statute, the jury might have found in his favor, and he should be granted a new trial. The trial court overruled the motion without explanation.

Although the court did not discuss this revised statute, the court did not err, because a reasonable juror could not conclude that Robert acted in justifiable self-defense. First, there is no evidence that any of Michael's words or actions conveyed a threat of force to cause death or great bodily harm to Robert. There was no evidence of a means of force displayed by Michael. Finally, Michael displayed no physical force by actions or by a weapon against Robert.

"To establish that a use of force is a justifiable defense, . . . the party claiming immunity must pass both a subjective and an objective test." *McCracken v. Kohl*, 286 Kan. 1114, Syl. ¶ 3, 191 P.3d 313 (2008).

Even though Robert testified that he believed Michael posed a threat to him, Robert walked away from the truck where Michael remained, returned to the truck with the rifle, and shot into the

truck. Robert's actions were not reasonable and were not the actions of a reasonable person defending himself against an imminent use of unlawful force. Robert's actions were neither objectively nor subjectively justified and did not merit a self-defense instruction. Under *McCracken,* we are to consider whether a reasonable person in the claimant's circumstances would have believed that a use of force—here using a gun—was necessary. 286 Kan. at 1119-20.

The dissent would have us believe Robert was acting as a reasonable person when he calmly walked away, got his gun, and shot into Michael's truck. The dissent focuses only on Robert's subjective belief and ignores the objective facts. The dissent makes many "presumptions" and "indications" concerning facts that are not in evidence. This appellate court does not consider presumptions or indications, does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence; we deal with the facts in the record. *State v. Ward,* 292 Kan. 541, Syl. ¶ 12, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Even though the dissent claims that the issue of whether the court erred in failing to give the self-defense instruction is a legal issue, the dissent mostly discusses and reweighs the facts and questions the credibility of the witnesses. The dissent focuses on the physical attributes of the brothers, ignoring the fact that their physical attributes were obviously before the jury to assess when they testified at trial.

It is disturbing when the dissent implies that only Robert was telling the truth, stating that Robert took an "oath to tell the truth," while ignoring the fact that all of the witnesses took an oath to tell the truth. The dissent also states that the sincerity of Robert's subjective belief should have been left to the jury. Robert's subjective belief was decided by the jury.

Robert stated that Michael acted violently after Robert shot into Michael's truck, shattering the back window, while Michael and Katheryn were sitting in the truck. Arguably, this is a nonissue because Robert had already committed aggravated assault and criminal threat before Michael ever got out of his truck.

Other evidence strongly undermines Robert's assertion that Michael posed an imminent threat to him. Initially, Michael was non-

confrontational when he came to retrieve the grain truck—he asked Matthew to get Robert's permission while he waited in the truck off of Robert's property. More importantly, as the State observes, Michael never left his truck until Robert shot at him. Michael also did not brandish a weapon or threaten to hurt Robert, verbally or by action. Michael had ample opportunity to exit his truck and physically confront Robert, but he did not. These facts are evidence that there was no imminent threat to Robert that would justify Robert's request for a self-defense instruction. See *State v. Brown*, 46 Kan. App. 2d 210, 213, 262 P.3d 1055 (2011).

Moreover, even though Robert claims that he and Michael had a history of confrontations, our court has stated that a "history of violence between the defendant and the victim does not transform an incident into a situation of imminent danger." *State v. Rivera*, No. 98,501, 2008 WL 5134688, at *5 (Kan. App. 2008) (unpublished opinion). Therefore, a reasonable person would not find Robert's assertion that Michael posed an imminent threat to him sufficient to justify Robert threatening to shoot Michael, retrieving and waiving his rifle, and then, ultimately, shooting into the truck cab where Michael was sitting. The evidence suggests that all of Robert's actions were not those of an individual acting in self-defense but were those of an aggressor.

Under K.S.A. 2010 Supp. 21-3214, the self-defense instruction under K.S.A. 2010 Supp. 21-3211 is not available to an individual who:

"(b) Initially provokes the use of any force against such person or another . . . ; or

"(c) Otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and such person has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) In good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

Robert's actions fall squarely within the actions proscribed in K.S.A. 2010 Supp. 32-3214 for an individual to whom the self-defense instruction is not available.

Robert suggested that the shooting was an accident, and if believed, this would undermine Robert's assertion that he acted *intentionally* in self-defense. See *State v. Stallard*, No. 99,365, 2009 WL 596536, at *4 (Kan. App. 2009) (unpublished opinion). Robert testified he intentionally pulled the trigger of the rifle. Similarly, a Riley County dispatcher testified that Robert repeatedly told the dispatcher, "I shot my brother," and when asked whether the shooting was an accident, Robert responded, "No."

The trial court did not err in refusing to give the self-defense instruction.

### DEFENSE-OF-PROPERTY INSTRUCTION

The same standard of review of a denial to give a requested self-defense instruction applies to the denial of a defense-of-property instruction. When the trial court refuses to give a requested instruction, an appellate court must review the evidence in a light most favorable to the party requesting the instruction. *Ransom*, 288 Kan. at 713. A defendant is entitled to instructions on the law applicable to his or her theory of defense if there is evidence to support the theory. *Hendrix*, 289 Kan. at 861. But there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding that a defense-of-property instruction should be given. 289 Kan. at 861.

Robert argues the trial court also erred in failing to grant his request for a defense-of-property jury instruction in accordance with K.S.A. 2010 Supp. 21-3213. Robert claims the trial court should have allowed him to present more evidence regarding the pasture burning incident because the evidence was relevant to support his defense-of-property issue.

Robert claims that the trial court erred by not allowing him to testify further about the pasture burning incident. Even if Robert had been allowed to testify further, the exclusion did not prejudice Robert's defense. Michael, Katheryn, and Robert all testified about the pasture burning incident, suggesting that Katheryn, not Michael, was responsible for the burning. Robert testified that he had no problem with Katheryn. Therefore, even if the court erred in

sustaining the State's objection, it is not reversible error. Robert was not prejudiced because the incident did not involve Michael.

K.S.A. 2010 Supp. 21-3213 articulates the justifiable force an individual may use in defending one's property:

"A person who is lawfully in possession of property other than a dwelling, place of work or occupied vehicle is justified in the use of force against another for the purpose of preventing or terminating an unlawful interference with such property. *Only such use of force as a reasonable person would deem necessary to prevent or terminate the interference may intentionally be used.*" (Emphasis added.)

The statute for defense of property, like K.S.A. 2010 Supp. 21-3211, is subject to the provisions of K.S.A. 2010 Supp. 21-3214. Robert's actions fall squarely within the actions that bar an individual from claiming a defense-of-property defense.

In rejecting Robert's request for a defense-of-property jury instruction, the trial court assumed that Robert did not initially know Michael was accompanying Matthew and Katheryn when he gave permission to Matthew to retrieve the grain truck. Assuming that Michael did not obtain permission to enter Robert's property, Robert did not order Michael off of his property when he approached Michael's truck. Robert claims he was duped into giving Matthew permission to enter his property; therefore, Michael was a trespasser, and he had an "absolute right" to force Michael to leave. It is interesting to note that Robert did not tell Michael to leave his property during their argument. It was not until Robert came back to the truck with the rifle that he told Michael to leave. Robert shot the rifle within seconds after telling Michael to leave. There is no evidence that Michael did any act to interfere with any of Robert's property or posed an imminent threat to Robert's property or cattle.

The questions then are: Was Robert defending his property and, more importantly, was he acting reasonably when he shot at Michael? The State articulates several arguments in support of the trial court's ruling that are consistent with our analysis above on the self-defense instruction issue concerning Robert's lack of a reasonable belief that he needed to use such force against Michael.

We find that the district court did not err in denying Robert's request for either a self-defense or a defense-of-property jury instruction.

Affirmed.

*　*　*

ATCHESON, J., dissenting: I respectfully dissent. The evidence, viewed in its entirety and under the proper standard, required the Pottawatomie County District Court to instruct the jury on self-defense in this case. The district court's error in failing to do so deprived Defendant Robert L. Bellinger of a fair trial on the aggravated assault and criminal threat charges on which the jury convicted him. Those convictions should be reversed and the case remanded for a new trial.

## I.

The current law of self-defense, which also applied at the time of Robert Bellinger's trial and on which the jury should have been instructed, is particularly robust. The law permits a person to threaten or to use markedly forceful means to deter imminent, unlawful physical contact of a distinctly less aggressive sort. Rather than walking away, a person—at least in some circumstances—arguably may brandish or discharge a firearm to avoid a slap in the face. Given the law and considering the facts favorably to Robert Bellinger, as we must, the jurors should have been allowed to make the call on self-defense. The majority opinion skirts evidence supporting the defense.

I have no idea what a just verdict in this case would be, and nothing in my analysis should be construed as reflecting any such suggestion. I did not see or hear the witnesses as they testified. I have read transcripts of their testimony, but that is no substitute for having observed them as they related their stories in open court. See *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008). The judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement. What I can say, and what appellate courts do decide, is whether evidence, if believed by the jurors, would support a particular defense. Here, there was sufficient evidence to instruct the jurors on self-defense. Those properly instructed jurors might then evaluate the witnesses along with the

physical evidence and come to an informed, reasoned conclusion about what actually happened and how the law should treat what happened. Proper jury instructions—those that cover the relevant issues and, in turn, correctly state the law—are essential gears in the machinery of justice. The machinery doesn't work right without them. It didn't here.

My principal disagreement rests with affirming the district court's refusal to give a self-defense instruction in this case. I do not specifically address the failure to give a defense-of-property instruction. But I also decline to join in the majority's ruling or reasoning on that issue, although it may be a closer question, in part, because the law itself is less than clear. For example, Robert Bellinger may have been acting in defense of "a place of work"—his ranch—thereby bringing the case under K.S.A. 2010 Supp. 21-3212 rather than K.S.A. 2010 Supp. 21-3213. The majority doesn't consider that possibility. If the case were being remanded for a second trial, in which defense of property likely would again come up as an issue, I would explore it further. See *State v. Wells*, 289 Kan. 1219, 1234, 221 P.3d 561 (2009) (although reversing on other grounds, court addresses points raised on appeal that might arise in retrial). To do so in dissent, however, would simply extend this opinion by wrestling with an abstraction.

## II.

When a defendant has made a timely request for an instruction on a theory of defense, as Robert Bellinger did here, the appellate courts treat the failure to give the instruction as a question of law, since no credibility determinations or other weighing of evidence figures into the analysis. See *State v. Simmons*, 45 Kan. App. 2d 491, 499, 249 P.3d 15, *rev. granted* 292 Kan. 968 (2011) (request for lesser-included offense instruction). The review, therefore, is plenary, and the appellate court owes no particular deference to the decision at the trial level refusing to instruct. See *State v. Gallegos*, 286 Kan. 869, 873, 190 P.3d 226 (2008).

In a criminal trial, a defendant is entitled to an instruction on a theory of defense if the evidence taken in the light most favorable to that position would permit a rational juror to find in keeping

with that theory. *State v. Baker*, 287 Kan. 345, Syl. ¶ 1, 197 P.3d 421 (2008) (compulsion instruction); *State v. Hill*, 242 Kan. 68, Syl. ¶ 4, 744 P.2d 1228 (1987) ("The trial court must instruct the jury on self-defense if there is any evidence tending to establish self-defense even though the evidence may be slight . . . ."). That is a minimal obligation because the defendant bears no particular burden of proof regarding self-defense. A jury need only conclude that the evidence of self-defense creates a reasonable doubt as to guilt to render an acquittal. *State v. Johnson*, 258 Kan. 61, 66, 899 P.2d 1050 (1995). A defendant's own assertions may provide adequate grounds to warrant an instruction. *Hill*, 242 Kan. 68, Syl. ¶ 4; see *State v. Walters*, 284 Kan. 1, 9, 159 P.3d 174 (2007). By the same token, other evidence alone may be enough. A defendant need not testify in support of a self-defense theory to establish a sufficient factual basis for an instruction. *State v. Heiskell*, 8 Kan. App. 2d 667, Syl. ¶ 6, 666 P.2d 207 (1983). In evaluating the evidence for that purpose, the appellate court must resolve every factual dispute and credibility determination in the defendant's favor. *State v. Sims*, 265 Kan. 166, 168-69, 960 P.2d 1271 (1998); *State v. Childers*, 222 Kan. 32, 49, 563 P.2d 999 (1977) (When a court looks at the evidence to decide on giving a self-defense instruction, " 'the test is not how much but is there any[.]' ") (quoting *State v. Smith*, 161 Kan. 230, 237, 167 P.2d 594 [1946]).

The broad facts here show that Robert Bellinger and his brother Michael had a sour relationship marked by verbal and physical confrontations throughout their adult lives. At the time of the confrontation giving rise to the charges here, they both were in their early 60s, Robert being the younger by a couple of years. Robert Bellinger raised cattle on the family place, while Michael did likewise on an adjacent parcel. The day before the confrontation, Robert Bellinger thought that Michael had mistreated cattle of his that had somehow gotten onto his brother's pastureland.

Michael and his ex-wife Katheryn Bellinger had an ongoing business relationship in, I presume, the ranching operation. Their son Matthew (and, thus, Robert Bellinger's nephew) worked on their ranch. On June 4, 2009, the day of the confrontation, those three drove to Robert Bellinger's ranch to retrieve a truck belonging to

Katheryn. Only Matthew spoke with Robert Bellinger to explain the purpose of the visit. Robert Bellinger apparently assumed Katheryn accompanied Matthew, but he did not expect to see Michael.

Robert Bellinger drove a tractor to a pole barn where Katheryn's truck had been parked. He began assisting Matthew in moving a piece of equipment that had been left in front of the truck. At some point, Robert Bellinger realized Michael had accompanied Katheryn and Matthew. He then approached Michael's pickup truck. At that point, Michael was in the driver's seat and Katheryn was on the passenger's side. Matthew was still in the pole barn.

Robert Bellinger and his brother got into a vigorous discussion about the treatment of each other's cattle and what Michael had supposedly done the day before. Depending who was describing the exchange, it was a loud, profane argument in which both brothers shouted and cursed. At trial, Robert Bellinger testified that his tone was firm but composed, while Michael became louder and more hostile as the discussion progressed. Michael testified that Robert Bellinger raised his voice and eventually said, "I'll kill you." Robert Bellinger denied saying anything of that sort. I infer that statement forms the basis of the criminal threat charge in violation of K.S.A. 21-3419(a)(1), although neither the charging instrument nor the jury instructions are precise. That is one of the charges on which the jury convicted.

Everybody, however, agrees Robert Bellinger went back to the pole barn and retrieved an old, rusted, lever-action .22 caliber rifle from an inoperable truck he kept there. The trial record is unclear about the distance from Michael's pickup truck to the pole barn. But it couldn't have been too far because Matthew remained in the pole barn and could hear the argument between his father and Robert Bellinger.

Armed with the rifle, Robert Bellinger returned to the driver's side of Michael's pickup and pointed the weapon at Michael. Robert Bellinger then told Michael to "get out of here" or "get off my property." Michael refused, saying he would not leave until he got Katheryn's truck. Robert Bellinger then shifted the rifle so it was pointed through the open driver's door window toward the back

window of the pickup. The rifle then discharged, shattering the back window. There is conflicting evidence about whether Robert Bellinger intended to fire or not. He testified on direct examination that he pulled the trigger without knowing for sure if the gun was loaded but expecting it would "dry fire"—the hammer would strike the empty chamber rather than a live cartridge. Robert Bellinger contended he meant to scare Michael into leaving. On cross-examination, Robert Bellinger suggested the rifle might have discharged without his having pulled the trigger. I presume either the pointing of the rifle into the cab of Michael's pickup or the firing of the rifle into the back window precipitated the charge for the aggravated assault of Katheryn under K.S.A. 21-3410(a). Again, neither the charging instrument nor the jury instructions were clear on the exact basis. That is the other charge on which the jury convicted.

At that point, Michael got out of the pickup and charged after Robert Bellinger. After hearing the shot, Matthew came out of the pole barn and saw what was happening. The accounts again conflict, but Michael ended up shot in the abdomen. Michael testified Robert Bellinger shot him when he got out of the truck. Katheryn testified to essentially the same. But she earlier had told the police Michael was shot while he was sitting in the truck, something that would have been nearly impossible given the location of the entry wound. Robert Bellinger testified that Michael grabbed the rifle and the two began wrestling for control of it. He said the rifle must have gone off during that struggle. Again, everyone agrees Michael did wrestle the rifle away from Robert Bellinger and then clubbed him in the head with it at least once. Michael and Matthew then got in the pickup with Katheryn. They drove to a hospital so Michael could be treated for the gunshot wound. Robert Bellinger called 911 and told the dispatcher he had shot his brother. Law enforcement officers promptly arrived at Robert Bellinger's ranch and took him into custody. They processed the scene and obtained statements.

In addition to the aggravated assault of Katheryn and the criminal threat against Michael, Robert Bellinger was charged with the attempted premeditated murder and aggravated battery of Mi-

chael. The jury found Robert Bellinger not guilty of the attempted murder and the aggravated battery. The district court gave no jury instructions related to self-defense.

That much of the factual and procedural history of the case more or less parallels what the majority opinion recounts and relies on in finding Robert Bellinger had no right to jury instructions on self-defense and defense of property. But there was considerably more evidence admitted at trial bearing directly on the propriety of those instructions that either gets short shrift in the majority's account and analysis or gets left out.

According to Robert Bellinger's testimony, Michael is physically much larger and more imposing than he. Asked to describe his brother's build, Robert Bellinger testified, "He's a monster." Robert Bellinger immediately added that Michael was "big, strong, [and] tough." Although the record generally indicates Robert Bellinger to be somewhat smaller, the disparity in size between the brothers is not readily apparent, since neither was asked his height or weight. Based on the available information, the court must assume for purposes of considering jury instructions that Michael was at least somewhat bigger than Robert Bellinger. The jurors, of course, saw both men during the trial and could consider those observations of their physical stature. Cf. Maxwell v. State, 828 So. 2d 347, 359-60 (Ala. App. 2000) (jurors may use their observations of a person in the courtroom, along with some other additional proof, in determining approximate age when no testimonial or documentary evidence specifically establishing age has been introduced) (cases cited); State v. Lauritsen, 199 Neb. 816, 818-20, 261 N.W.2d 755 (1978) (jury may consider defendant's appearance as circumstantial evidence in conjunction with other evidence in determining his age).

Robert Bellinger testified that before June 4, 2009, he had been "involved in physical fights" with Michael. He told the jury he had never started one of those fights but had always come out on the losing end and always with injuries. The record contains no more information about that purportedly turbulent history between the brothers.

Robert Bellinger also testified that as the result of an injury, he has a withered left arm. He told the jury he is unable to lift more than 15 pounds and cannot grip and hold more than 4 pounds with his left hand. That, he testified, rendered him effectively "one-armed" in trying to repel a physical attack. He also said that he has "bad knees" and is unable to run.

Robert Bellinger described Michael to the jury as "very hot-headed." He said Michael had "a look of aggression and hate" on his face as the two discussed or argued over the treatment of their respective cattle. At that point, Michael "was ready to come out of that cab [of the pickup] and beat the hell out of me," according to what Robert Bellinger said at trial. Robert Bellinger also told the jury he had "definitely" concluded Michael intended to physically assault or fight him. Robert Bellinger explained his actions to the jury this way: "I didn't want to get beat up . . . and so I went and retrieved the rifle."

During the trial, the district court limited the evidence about the brothers' physical confrontations to a generic narrative of that relationship and precluded any details about specific incidents. In doing so, the district court considered the evidence as bearing on Michael's character. But the district court also recognized the evidence bore on Robert Bellinger's state of mind related to self-defense. In a strict sense, the evidence probably should have been offered and received only for Robert Bellinger's subjective belief regarding self-defense and what a similarly situated reasonable person might believe. See *State v. Ricks*, 257 Kan. 435, 439-40, 894 P.2d 191 (1995).

The district court has the authority to limit evidence to avoid undue confusion or consumption of time—avoiding "mini-trials" over the circumstances of the fights between Robert Bellinger and his brother, let alone their very existence, could be an appropriate reason to curtail that evidence. Defense counsel did not make a proffer as to the details of particular confrontations. But the number of the supposed confrontations, when the most recent one took place, and the nature of Robert Bellinger's injuries *might* have been sufficiently relevant to warrant admission. If the last fight were 20 years ago and the worst injury Robert Bellinger claimed

was a split lip, that would be far different from a fight earlier in 2009 that sent him to the emergency room. Ultimately, however, the district court could have concluded much of that detail would have created an inappropriate distraction for the jury. Given the absence of those details from the record and the majority's decision to affirm the convictions, further discussion of the evidentiary implications would be another needless abstraction.

## III.

If believed by the jurors, the evidence actually admitted at trial would show Robert Bellinger to be crippled in ways that significantly diminished his ability to protect himself against physical assault. It would show that Michael was much bigger and stronger. Michael had repeatedly attacked Robert Bellinger and, in doing so, inflicted physical injury on him. Michael had a volcanic temperament; he could become suddenly angry and combative. And on June 4, 2009, Michael argued loudly with Robert Bellinger in an escalating confrontation on Robert Bellinger's ranch. Robert Bellinger saw Michael becoming enraged in the same manner that had culminated in the earlier beatings.

Again, if accepted by the jury, those circumstances prompted Robert Bellinger to enter the nearby pole barn, grab the rifle, go back to Michael's pickup, and order his brother to leave the property. When Michael refused, Robert Bellinger fired the rifle between his brother and Katheryn, breaking the back window of the truck.

Those circumstances are not inherently implausible and cannot, therefore, simply be discarded. There were, of course, varying accounts of the circumstances. Michael's version attributed to Robert Bellinger the statement—"I'll kill you"— that supported the criminal threat charge. Katheryn admittedly gave conflicting accounts. And Robert Bellinger's testimony was not wholly consistent. But those differences are for the jurors to sort out. The substance of the differing accounts or the very existence of differing accounts does not inform the proper scope of the jury instructions. As I explain, the circumstances warranted instructing the jurors on self-defense when properly viewed for that purpose. Whether the ju-

rors would have accepted that defense is an entirely different matter, and it is not the matter before us.

Likewise, the wisdom of the statutory regimen for self-defense is not a matter of this court's concern. Whether my conception of sound public policy would embrace even an arguable claim for self-defense in this case is beside the point. The evidence, however, supports a colorable defense based on the governing statutes.

As provided in K.S.A. 2010 Supp. 21-3211(a), the statute in effect at the time of trial, a person "is justified in the use of force" to defend himself or herself "when and to the extent it appears to such person and such person reasonably believes such use of force is necessary to defend . . . against . . . [the] imminent use of unlawful force." As I discuss later, "use of force," as defined in K.S.A. 2010 Supp. 21-3221(a)(1), includes threats to use force, the display of weapons, and "the application of physical force." A legally sufficient claim of self-defense requires evidence supporting both a subjective belief on the part of the defendant that the use of force was necessary and an objective determination that a reasonable person would have come to the same conclusion. *Walters*, 284 Kan. at 9; *City of Wichita v. Cook*, 32 Kan. App. 2d 798, Syl. ¶ 1, 89 P.3d 934, *rev. denied* 278 Kan. 843 (2004). A defendant claiming self-defense must honestly believe his or her use of force to be required under the circumstances. But if that honest belief is the product of a delusion or a misperception of a threat—where someone without similarly impaired cognitive abilities or misapprehensions would sense no danger—a defendant lacks legal grounds to assert self-defense. The objective determination must be evaluated from the perspective a reasonable person similarly situated to the defendant. For example, what a frail 90-year-old reasonably perceives as imperiling may not necessarily be the same as what a starting linebacker for the Chiefs would so perceive. Both likely would take the same view of a scrawny 15-year-old pointing a handgun at them. But they might not if that teenager had no weapons and merely threatened to hit them.

A defendant claiming self-defense must perceive that another person intends an "imminent use of unlawful force" before resorting to his or her own use of force to prevent any harm to himself

or herself. Imminent means "ready to take place." Merriam-Webster's Collegiate Dictionary 621 (11th ed. 2003); see The American Heritage Dictionary 879 (5th ed. 2011) (imminent means "about to occur" or "impending"). The defendant, therefore, need not await the beginning of an attack before responding. He or she may act to prevent an attack he or she reasonably senses to be impending.

Here, Robert Bellinger took an oath to tell the truth and then testified that he retrieved the rifle because he believed Michael was about to physically assault him. There was no doubt Michael had begun shouting and cursing before Robert Bellinger got the rifle. There were differing accounts of Robert Bellinger's composure. Just how the majority concludes that Robert Bellinger's statement under oath failed to create a jury question about his honest, albeit subjective, belief he needed to defend himself eludes me. The credibility of witnesses is for the jurors to determine. And the sincerity of Robert Bellinger's subjective belief should have been left to them. Equally puzzling to me is the majority's assertion that the jurors hearing the case actually reached a decision on Robert Bellinger's subjective belief about the need to defend himself in the face of an imminent threat of bodily harm. I presume that majority concludes the jurors came down against Robert Bellinger, although the opinion does not say. Nor does the majority explain why or how the jurors would have considered the issue in the absence of any self-defense instructions informing them of it or the applicable legal standards.

Determination of the objective component also should have been entrusted to the jurors. Taking the evidence most favorably in support of instructing the jury, we must conclude Michael was much bigger and stronger than Robert Bellinger. We must presume Robert Bellinger to have physical limitations that would keep him from physically defending himself without resorting to weapons of some sort. And we must accept that Michael had repeatedly beaten up Robert Bellinger. So Robert Bellinger knew the signs that Michael was about to go into a violent rage. He saw those signs on June 4. These were not strangers exchanging words in a bar where angry bluster might be just that and not a prelude to physical

assault. We then must ask, assuming the jurors accepted all of that, could they conclude a reasonable person would have believed a physical attack to be at hand? The answer must be, "Yes, a jury could." That reasonable person's belief would rest not merely on a bare opinion but on the objective circumstances of the physical disparities between the individuals, their history of one-sided abuse, and the events of June 4. Now, jurors actually weighing the evidence might choose to disbelieve some or all of those circumstances or might find them insufficient, even if true, to support an objective belief on Robert Bellinger's part that he faced a physical assault. But a court could not fairly say that a jury would necessarily reject that evidence or reject the conclusion that a reasonable person standing where Robert Bellinger stood would have held a legitimate fear of being beaten.

The same dual evaluation of subjective and objective belief applies to the degree of force a defendant contends was necessary, so long as the force does not exceed the statutory bounds. That is, the defendant must honestly believe he or she needed to use the force actually deployed, and a reasonable person in the same circumstances would have reacted in a comparable way. See *State v. Deal*, 293 Kan. 872, 889-90, 269 P.3d 1282 (2012); *State v. Gayden*, 259 Kan. 69, 83, 910 P.2d 826 (1996) (To determine if giving a requested self-defense instruction is legally appropriate, a court must view the evidence most favorably toward doing so and decide "whether [the] defendant believed that the force used was necessary . . . and whether facts exist which would support such a belief.").

The legislature has defined "use of force" in K.S.A. 2010 Supp. 21-3221(a)(1), thereby outlining the permissible limits of what a person may do to defend himself or herself absent an imminent threat of death or great bodily injury. Legally permissible "use of force" includes: "(A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another." K.S.A. 2010 Supp. 21-3221(1). Boiling down the verbiage, the self-defense statutes per-

mit a person to defend himself or herself by making threats of force, including deadly force; drawing a firearm or another weapon and brandishing it in a threatening manner (display of means of force); or discharging a firearm as a warning (an application of physical force). Any of those actions may be taken to resist non-lethal force. Deadly force is separately defined in K.S.A. 2010 Supp. 21-3221(a)(2) and entails "the application of any physical force . . . likely to cause death or great bodily harm." Deadly force may be used to resist if the person reasonably believes he or she faces death or great bodily harm. K.S.A. 2010 Supp. 21-3211(b). All of those definitions became effective shortly before Robert Bellinger's trial in May 2010 and applied in that proceeding. See L. 2010, ch. 124, sec. 1 (legislation containing K.S.A. 21-3221 went into effect April 29, 2010; provisions of Act to be applied retroactively). This is not a deadly-force, self-defense case as it pertains to the aggravated assault or criminal threat charges.

In 2006, the Kansas Legislature amended the central self-defense statute to include a sweeping no-duty-to-retreat provision. L. 2006, ch. 194, sec. 3. It provided: "Nothing in this section [establishing self-defense] shall require a person to retreat if such person is using force to protect" himself or herself or a third person. K.S.A. 2006 Supp. 21-3211(c). The absence of any duty to retreat before using force in self-defense materially changed Kansas law and substantially expanded what might be considered reasonable force in many circumstances. This case is illustrative of that expansion.

Before the 2006 change to K.S.A. 21-3211, the Kansas courts recognized an ill-defined, though comparatively constricted, common-law right of persons threatened in or around their homes to use force without having to retreat. See *Ricks*, 257 Kan. at 437 (noting the common-law duty had been little discussed for more than half a century and finding it applicable when "a nonaggressor . . . [has been] menaced on home ground"); *State v. Scobee*, 242 Kan. 421, 428-29, 748 P.2d 862 (1988) (reaffirming common-law rule and its application). The *Ricks* decision cited *Scobee* as illustrative of the circumstances in which a person would have no common-law duty to retreat before resorting to force in self-defense. In *Scobee*, two men, one of whom wielded an iron pipe, accosted

the defendant just after he pulled into the driveway of his home. The defendant drew a handgun and fatally shot one of the men. The Kansas Supreme Court reversed defendant's conviction for involuntary manslaughter because the trial court had declined to give a no-duty-to-retreat jury instruction. 242 Kan. at 429. After *Scobee* and before the 2006 amendment to K.S.A. 21-3211, the Kansas Supreme Court found no error in refusing to instruct on self-defense in large part because the defendant used force in a public place when he could have easily retreated. See *State v. Gonzales*, 282 Kan. 73, 113, 145 P.3d 18 (2006).

But the obligation of a defendant to retreat rather than to use force has been removed from any legal calculus of the core right of self-defense as the result of the amendment to K.S.A. 21-3211. The reasoning and result on claims of self-defense in cases like *Gonzales* have been superseded by the amendment. The proper inquiry now must be this: Given a defendant's decision to stand his or her ground, did the defendant use the amount of force he or she honestly believed necessary and the amount of force a reasonable person, similarly situated, would believe necessary to thwart an imminent attack? In deciding how to instruct a jury, the district court must answer the question based on what that jury properly might conclude from the evidence when viewed most favorably to the defendant.

Turning first to the criminal threat charge, the evidence showed that Robert Bellinger may have told Michael, "I'll kill you." The statement would have been made before Robert Bellinger went to the pole barn to get the rifle. The statement, if made in response to an imminent threat of physical harm, would seem to be a permissible form of self-defense. It amounts to "words . . . convey[ing] the threat of force, including . . . death or great bodily harm" and, thus, is a defined and permitted "use of force" for self-defense. K.S.A. 2010 Supp. 21-3211(a); K.S.A. 2010 Supp. 21-3221(a)(1)(A). The same circumstances that support Robert Bellinger's subjective belief he faced an imminent threat of physical harm similarly support such a belief as to the making of that statement to prevent the threat from becoming a reality. A jury might fairly conclude that a crippled man attempting to deter an assault

from a bigger, stronger man who had beaten him in the past and was repeating the behaviors that immediately preceded those beatings reasonably could resort to a threat of death to accomplish that deterrence. Words, even threatening ones, inflict no physical harm and, thus, represent a fairly restrained form of self-defense. If Robert Bellinger overstepped the bounds of legally permissible self-defense in making that statement, the determination rests with a jury based on its studied consideration of the evidence.

Robert Bellinger's actions in brandishing the rifle at Michael while he sat in the cab of his pickup and then firing a bullet through the back window present a more complex call. Those actions resulted in a charge of and conviction for aggravated assault of Katheryn on the theory of transferred intent. In other words, the State argued that Robert Bellinger used a deadly weapon to place Michael "in reasonable apprehension of immediate bodily harm." See K.S.A. 21-3408; K.S.A. 21-3410 (defining crime of aggravated assault); K.S.A. 21-3408 (defining crime of assault). And, according to the State, Robert Bellinger's criminal intent also applied or transferred to Katheryn because she was sitting next to Michael in the pickup and those actions reasonably placed in her in fear of harm. Whether analyzed as a matter of transferred intent or simply an application of the definition of the crime of aggravated assault, Robert Bellinger could be criminally accountable for an aggravated assault of Katheryn if his actions were not otherwise legally excused or justified. Self-defense, however, would furnish a legal justification.

The law recognizes that a person acting in self-defense lacks the requisite bad intent to be found guilty of crimes charged based on those actions, and that is true whether the purported victim of the crime is the person the defendant feared or a bystander in the wrong place. If a defendant legitimately acts in self-defense, he or she is commonly not criminally responsible for harm to third parties. *State v. Clifton*, 32 Ohio App. 2d 284, 286-87, 290 N.E.2d 921 (1972) (The court recognizes that "one who kills in self-defense does so without the *mens rea* that otherwise would render him culpable of the homicide" and concludes that the absence of criminal intent also shields the individual from criminal liability for

harm done to a third party as a result those actions.); LaFave, Substantive Criminal Law § 10.4(g) (2d ed. 2003) ("If *A* in proper self-defense aims at his adversary *B* but misses *B* and unintentionally strikes innocent bystander *C*, he is not liable for *C's* injury or death."). The principle, often couched in terms of transferred intent, is well established. *Nelson v. State*, 853 So. 2d 563, 565 (Fla. Dist. App. 2003) (conviction reversed for failing to give jury instruction on transferred self-defense); *People v. Blue*, 343 Ill. App. 3d 927, 936, 799 N.E.2d 804 (2003) ("Under the doctrine of transferred intent, defendant can be exonerated if he shoots an assailant in self-defense but injures another; defendant's intent to shoot his assailant in self-defense is transferred to the unintended victim."); *Rogers v. State*, 994 So. 2d 792, 802 (Miss. App. 2008) (defendant could not be found guilty of aggravated assault of bystanders in bar when he fired handgun in self-defense and struck them while shooting at the person menacing him with a handgun); *Clifton*, 32 Ohio App. 2d at 287 (conviction reversed for failing to give jury instruction on transferred self-defense); *Holloman v. State*, 51 P.3d 214, 221 (Wyo. 2002) ("The general rule is that if a person acting in necessary self-defense unintentionally injures or kills a third person, he is not guilty of homicide or assault and battery."). The Kansas appellate courts apparently have not addressed self-defense in that context or, at least, in those terms. The doctrine, however, is entirely compatible with the current statutory scheme of self-defense.

Robert Bellinger's action in pointing the rifle at Michael and, thus, very near Katheryn amounted to a use of force authorized in K.S.A. 2010 Supp. 21-3221(a)(1)(B) as the "display of the means of force." That is true even if the weapon may readily inflict lethal injury. K.S.A. 2010 Supp. 21-3221(a)(2). The discharge of the rifle at the rear window of the pickup also reflects a statutorily allowed "use of force" under K.S.A. 2010 Supp. 21-3221(a)(1)(C) (permitting the "application of physical force"). The application of force does not constitute "deadly force" under the self-defense statutes unless it "is likely to cause death or great bodily harm." K.S.A. 2010 Supp. 21-3221(a)(2). Robert Bellinger testified he pointed the rifle at the rear window before he pulled the trigger precisely

because he wanted to avoid shooting Michael, as opposed to scaring him into leaving the ranch. We must accept that representation in weighing the propriety of the jury instructions. The majority suggests that "miraculously" neither Katheryn nor Michael was injured. But the bullet went exactly where Robert Bellinger said he aimed the rifle and struck neither of them.

Without belaboring the point, Robert Bellinger's testimony created a jury question about his honestly held belief that he had to resort to a level of force reflected in pointing the rifle in the vicinity of Michael and Katheryn or in firing it near them to deter what he perceived as Michael's impending attack. He testified to that effect. While Robert Bellinger hedged some about whether he was sure the rifle was loaded, he understood that it might have been. Either way, however, his actions fell within the permitted "use of force" under the self-defense statutes. The sincerity of his belief that the level of force was necessary should have been for the jury.

As to the objective reasonableness of pointing and firing the rifle, I again want to avoid undue repetition. But a reasonable person in the same position as Robert Bellinger—with the same physical impairments, the same knowledge of Michael's volatile behavior, and the same observation of his rising agitation on June 4—could have concluded getting the rifle and then firing it was necessary to stave off a significant beating. The discharge of the rifle was, in effect, a warning shot.

Two additional circumstances bolster that determination. First, Robert Bellinger had no duty to retreat, so that cannot be weighed against the reasonableness of the force used. On a favorable reading of the evidence, it is debatable whether he could have retreated because his knee problems prevented him from traveling any faster than a walk. Second, after he retrieved the rifle, Robert Bellinger told Michael to leave the property. Michael adamantly refused. Coupled with the rest of the facts as the defense portrays them, the exchange would objectively support a reasonable perception that Michael's belligerence and bellicosity had not abated but were, if anything, more pronounced. In that light, a jury could find Robert Bellinger's use of force comported with what a reasonable person would have done in his position. He fired a single shot with

the intent to scare Michael, not to injure or kill. As I have said, a jury could well reject some of those factual representations or could well reject self-defense on the aggravated assault charge even crediting all of them. But that would not be the inexorable outcome and, rather, demonstrates that the issue should have been for the jurors. The district court erred in taking it from them by not instructing on self-defense.

## IV.

To bolster its conclusion that no self-defense instruction should have been given in this case, the majority cobbles together several arguments that are unavailing singly or collectively. The majority "suggests" Robert Bellinger acted as the aggressor and gussies that up with an argument that he retreated to get the rifle. The majority then suggests Robert Bellinger fired the rifle accidentally and, therefore, gets no self-defense instruction. I take those points up in order.

Someone provoking a confrontation enjoys only a very limited right of self-defense should the affray turn to his or her disadvantage. K.S.A. 2010 Supp. 21-3214. The majority says the "evidence suggests" Robert Bellinger acted as the initial aggressor and his "actions fall squarely within" the conduct described in K.S.A. 2010 Supp. 21-3214 depriving a person of the right of self-defense on that basis. But the majority never identifies Robert Bellinger's initial provocation of Michael.

If the initial provocation were Robert Bellinger's actions in getting the rifle, brandishing it, or firing it—on the theory that he wanted to goad Michael into attacking him so he could then shoot Michael—the argument simply reflects the other side of the self-defense coin. Had Robert Bellinger acted in that way to provoke Michael so that he might then respond with force in the guise of defending himself, he could not claim a right to self-defense. See K.S.A. 2010 Supp. 21-3214(b). But recasting the legal argument as one over Robert Bellinger's status as an initial aggressor doesn't change the evidence, when viewed most favorably to him, and doesn't change the trial court's obligation to instruct on self-defense. If the jurors were to discredit Robert Bellinger's version or

they were to find that version insufficient to create a reasonable doubt about his guilt, they necessarily would conclude he did not act in self-defense and was, therefore, an unlawful aggressor. That argument might well have entitled the State to an initial-aggressor instruction to complement the other self-defense instructions that should have been given to the jury. But it does not preclude Robert Bellinger's theory of self-defense as a matter of law, depriving him of any jury instructions.

Another theory would have Robert Bellinger becoming an initial aggressor at the point he returned from the pole barn with the rifle on the grounds he had retreated from the confrontation only to reengage Michael after he had obtained a deadly weapon. While a person has no duty to retreat under Kansas law, a person may choose to do so. And, having done so, the person may well be considered an aggressor unable to lay claim to self-defense if he or she rejoins or reignites the confrontation. But the retreat must be to a place of safety. See *People v. Flax*, 147 Ill. App. 3d 943, 951, 498 N.E.2d 667 (1986); *People v. Lenkevich*, 394 Mich. 117, 121, 229 N.W.2d 298 (1975); LaFave, Substantive Criminal Law 10.4(f) (2d ed. 2003) ("[E]ven in those jurisdictions which require retreat, the defender need not retreat unless he knows he can do so in complete safety[.]"). The facts here, however, do not depict so clear a scenario. As I have noted, the pole barn was close to Michael's pickup, so Robert Bellinger's movement there could not be considered an obvious retreat so much as an effort to obtain a means of self-defense. A lone individual outnumbered and accosted in a parking lot in an aggressive, threatening manner would have a right under Kansas law to go to his or her car, perhaps some distance away, to get a handgun from the glove box. That would not turn the individual into an initial aggressor as a matter of law. Depending on how the events unfolded, there might be jury issues. Here, too, Robert Bellinger did not arrive at a place of safety by going into the pole barn. It was not an enclosed, secured structure that would have afforded protection against an assailant.

Perhaps the majority means to say that Robert Bellenger became the aggressor when he first approached Michael's pickup and questioned his brother about the treatment of his cattle the day before,

thereby hoping to instigate a physical confrontation as an excuse to shoot. But that seems even less plausible. Robert Bellinger was not armed when he first engaged Michael on June 4 and only got the rifle after the discussion escalated into a heated argument—perhaps only on one side, perhaps mutually. The rifle itself was rusted and, if we accept Robert Bellinger's testimony, possibly dysfunctional or unloaded. It would not have been the obvious weapon of choice for an aggressor attempting to turn a spat into a shooting. The argument would make more sense and carry considerably more legal weight had Robert Bellinger initially come up to Michael with a handgun concealed in the back of his waistband. See *Ricks*, 257 Kan. at 437-38 (refusal of no-duty-to-retreat instruction proper when defendant "took his gun with him before anything occurred").

In short, under the facts, the State might have been entitled to an initial-aggressor jury instruction to accompany the others outlining the law of self-defense. I offer no conclusive determination, not having seen the witnesses testify. But the evidence was not so clearly the State's way that Robert Bellinger must have been deemed an aggressor, thereby depriving him of the opportunity to argue self-defense to a properly instructed jury. The majority's position to that effect is undone by its own characterization that the "evidence suggests" Robert Bellinger acted as the initial aggressor. Assuming the circumstances do so suggest, the criminal justice system entrusts jurors with the task of deciding if suggestions conform to reality.

The majority also holds that Robert Bellinger's equivocal testimony about whether the rifle discharged accidentally precludes a self-defense instruction. As I have pointed out, Robert Bellinger also testified he purposefully pulled the trigger while the rifle was pointed at the rear window of Michael's pickup. The majority acknowledges both the discrepancy and other evidence supporting the view that the discharge of the weapon was intentional rather than accidental. The majority concludes that "if believed," Robert Bellinger's testimony suggesting the firing of the rifle was accidental would preclude self-defense. That might be correct, but it proves too little. The jurors should have determined what was to

be believed. They could then have applied the law, as contained in the instructions, to those determinations. But, of course, the jurors were unable to properly complete that task because they had not been instructed on all of the appropriate law.

Far from precluding an instruction on self-defense, the majority's argument more properly supports giving instructions on self-defense and, in the alternative, accident. See, e.g., *Holmes v. State*, 292 Kan. 271, 276-77, 252 P.3d 573 (2011) (defense counsel performed effectively in arguing to jury shooting was accidental or, alternatively, self-defense, especially "[g]iven the conflicting facts"); *State v. Farley*, 225 Kan. 127, 132-34, 587 P.2d 337 (1978) (in fatal shooting, instructions given on self-defense, defense of others, defense of dwelling, and accident). An accidental firing of the rifle would have been inconsistent with the intent element necessary for aggravated assault and, thus, a defense.

The unpublished Court of Appeals decision the majority cites *State v. Stallard*, No. 99,365, 2009 WL 596536 (Kan. App. 2009), fails to support its contention. In that case, Stallard, an inmate in the El Dorado prison, contended he struck a correctional officer by accident rather than intentionally and, therefore, should not be found guilty of battery of the officer. He denied any contact whatsoever with a second officer. At trial, Stallard presented no evidence and never argued that he struck either officer in self-defense. He unequivocally testified the only physical contact he had was accidental. 2009 WL 596536, at *3. Accordingly, this court rejected Stallard's argument that his trial counsel had been ineffective by failing to request an instruction on self-defense. See *State v. Sims*, 265 Kan. 166, 960 P.2d 1271 (1998) (no error in refusing self-defense instruction when defendant denies any involvement in shooting giving rise to criminal charge); *State v. Sims*, 262 Kan. 165, 172-73, 936 P.2d 779 (1997) (same).

The accident argument does not relate to or preclude Robert Bellinger's right to a self-defense instruction on the criminal threat charge.

Finally, the majority tries to unhinge my position by saying I have looked at the evidence in a way that favors Robert Bellinger and that discounts contrary or conflicting evidence in the record.

But in deciding whether a trial judge has erred in failing to give a requested jury instruction, this court must consider the evidence just that way. The majority characterizes my review as *impermissible* "reweighing" of facts and "questioning" of witness credibility. To the contrary, I have taken the evidence most favorably to Robert Bellinger's request for self-defense instructions. To the extent that is a one-sided view of the evidence—and it most assuredly is—that is the view the law requires. The weighing of facts and questioning of credibility must be left for the properly instructed jurors.

The majority also cites *State v. Ward*, 292 Kan. 541, Syl. ¶ 12, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), as reflecting the proper review of the evidence. But that point comes from a discussion in *Ward* describing how appellate courts should review the record when a criminal defendant challenges the sufficiency of the evidence to support a jury verdict of guilty. 292 Kan. at 581-82. In that instance, the record must be construed favorably to the State and against the defendant. Here, the review is supposed to be exactly the reverse.

V.

Human endeavors are often messy, perhaps no more so than when they turn violent and people wind up seriously injured or dead. The trauma of witnessing those sorts of events can confuse and confound recollections. This is a case in which the facts surrounding a few minutes in the lives of the Bellinger clan on June 4, 2009, are messy. Taking those facts most favorably to Robert Bellinger, he has presented circumstances permitting him to advance a claim of self-defense. We have juries to clean up those messes by weighing evidence, evaluating credibility, and finding facts. But juries then must be fully instructed on the relevant law to know what to do with those facts. The jury in Robert Bellinger's trial was not so instructed. And as a result, he was deprived of a fair hearing on his claim of self-defense. He is, in my view, entitled to another trial.