NOT DESIGNATED FOR PUBLICATION

No. 114,315

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHAWN ULMER,
*Appellant.*


MEMORANDUM OPINION


Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed December 23, 2016. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Johnathan Grube*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, C.J., GREEN and LEBEN, JJ.


LEBEN, J.: Shawn Ulmer fixed cars as a hobby. He made a deal with an acquaintance to put an engine in her car, but he couldn't get the car to run. He thought he'd done what he had agreed to do by just putting the engine in; the acquaintance thought he also was supposed to get the car to actually work. Tensions flared, particularly between Ulmer and the boyfriend of the car's owner.

Those tensions boiled over when the boyfriend came to Ulmer's house. Ulmer admitted to hitting the man with a ratchet and to throwing a tire iron through the

windshield of the man's car. Ulmer claimed that he had hit the man with the ratchet both in self-defense and in defense of his dwelling, but the district court refused to give the jury the option of acquitting Ulmer based on those defenses. The jury convicted Ulmer of aggravated battery (here, knowingly causing great bodily harm or disfigurement to another person) and criminal damage to property.

Ulmer has appealed, mainly arguing that the district court should have given the jury instructions about self-defense and defense of a dwelling. But neither defense applied on the facts presented here:

- Ulmer's self-defense claim fails because he was, at best, a mutual combatant, having been the first to make physical contact as he tried to lead the other man out of the house. Self-defense is usually not applicable in cases of mutual combat. See *State v. Caton*, No. 110,411, 2014 WL 6777415, at *2 (Kan. App. 2014) (unpublished opinion) (citing cases).

- Ulmer's defense-of-a-dwelling claim fails because the victim entered Ulmer's home lawfully, having been let in by Ulmer's roommate, and hadn't attacked either the dwelling or its occupants. The statute on defense of a dwelling, K.S.A. 2015 Supp. 21-5223, allows the use of force only when necessary "to prevent or terminate such other's unlawful entry into or attack upon such person's dwelling." Neither situation was present when Ulmer struck the victim.

In addition, Ulmer raises two other claims regarding how the trial transpired, but in each case, if an error occurred, it didn't affect the trial's outcome. Once one determines that Ulmer wasn't entitled to claim self-defense or defense of a dwelling, the evidence against him is overwhelming—he admits hitting the other man in the head with a ratchet. And the jury quite reasonably found that this caused great bodily harm—the victim received both staples and stitches to close his head wound, lost two teeth, and suffered other cuts and bruising to his face, hands, and arms. We therefore affirm the district court's judgment.

2

Ulmer and Leann Moore agreed that she would sell him her Ford Probe for $400 if he put a motor in her Jeep. When recounting their deal later, the two disagreed about the precise terms of the agreement. Moore said she believed that Ulmer would get the Probe only if the Jeep worked after he installed the motor. Ulmer said that he had expressed concerns about the quality of the motor that Leann's boyfriend, Keith Brentlinger, had picked out and had warned Moore that the Jeep might not work even after installing it. According to Ulmer, once he finished installing the motor and paid the money, the Probe belonged to him, regardless of whether the Jeep ran.

Somewhere between a few days and a week before November 2, 2014, Moore went to Ulmer's house to discuss the status of the repairs on the Jeep and to get the rest of the $400 that Ulmer owed her because he had already taken possession of the Probe. Moore testified that during this interaction, Ulmer had begun "getting loud" and had made her "feel uncomfortable." Moore said that during the exchange, her phone had accidentally dialed Brentlinger, allowing Brentlinger to hear the conversation. Brentlinger then drove over to Ulmer's house because he was upset by how Ulmer was talking to Moore.

Ulmer testified that he had told Moore that the engine was installed but was making a clanking sound, leading him to think there was something wrong with the engine. He also testified that Brentlinger had been highly critical of his work and had told Moore not to give him the title to the Probe. As tensions flared, Moore claimed that Ulmer "got up in [Brentlinger's] face, and [Brentlinger] just stood there." Ulmer testified that Brentlinger had said, "Do you want some of me? I'll show you where the rubber meets the road." Brentlinger said he didn't recall saying that but acknowledged that he did use that expression periodically.

Moore testified that Ulmer had said to her that he didn't like the way Brentlinger had spoken to him and that if Brentlinger ever spoke to him like that again, he would hit Brentlinger "upside the back of his head." Moore replied that Ulmer couldn't win in a fight with Brentlinger, even on his best day. After the disagreement, Ulmer told them to get the Jeep off the property. He claimed that he also told them to leave and not come back. Brentlinger testified that Ulmer hadn't told him not to come back. The next day, Moore and her boss towed the Jeep to her work. Later, Moore returned to retrieve the Probe, although Ulmer had paid the entire $400.

On November 2, 2014, Brentlinger and Moore's boss began working on the Jeep and, as they both later testified, found a paint scraper in the oil pan. Later that night, Brentlinger decided to go to Ulmer's house, which Ulmer shared with the owner, Everett Lumley, to return the scraper. Both Moore and her boss told Brentlinger not to go over that night to return the scraper because it wasn't "wise." When Brentlinger arrived, Lumley answered, Brentlinger asked to speak with Ulmer, and Lumley invited Brentlinger inside. After that point, the parties' stories diverge.

We will start with Brentlinger's version of the events. According to Brentlinger, Ulmer immediately became defensive and told him that there was no way he'd found the paint scraper in the oil pan. Ulmer then said that they should settle things and walked outside. When Ulmer returned, he said, "You can have the free tire iron that's in your windshield." Brentlinger testified that he hadn't responded to Ulmer's comment and had just kept talking with Lumley about the work on the Jeep. He claimed that while he had been talking with Lumley, Ulmer had come up behind him and hit him on the back of the head with a metal pipe, which he saw in his periphery just before it struck him. Ulmer then struck him again on the arm, and the two scuffled as Brentlinger tried to get the object away. Brentlinger said that Lumley eventually intervened to get the pipe away from both of them. Brentlinger denied ever striking or punching Ulmer. After the fight,

4

Lumley got Brentlinger a towel to control the bleeding. Brentlinger then called the police and waited for them at the end of Lumley's driveway.

Ulmer testified to a different series of events. He said that he had been hanging out with Lumley and two acquaintances, Mark and Harold Wardlow, when Brentlinger arrived and Lumley answered the door. Ulmer claimed he had heard Brentlinger tell Lumley that the sound in the Jeep's motor had been caused by the paint scraper. Ulmer joined them in the kitchen and told Brentlinger that the sounds had come from a different part of the motor. Ulmer said he had then asked Brentlinger to leave and said that Brentlinger had only come over to make trouble. Ulmer testified that he had gone outside to get some fresh air and had started putting away some tools he had out. He then went back inside and again told Brentlinger to leave, but Brentlinger refused to do so. At that point, Ulmer admitted, he went outside and threw a tire iron at Brentlinger's windshield to get Brentlinger's attention and to make him leave. Ulmer testified that he had gone back into the kitchen, told Brentlinger he could have the free tire iron in his windshield, and asked Brentlinger to leave.

When Brentlinger refused to move, Ulmer said that he had grabbed Brentlinger by the arm and started showing him to the door. Ulmer testified that he had had a ratchet in his hand that he hadn't put away. According to Ulmer, Brentlinger then grabbed him, ripping his shirt, and the two began fighting. Ulmer acknowledged that he had hit Brentlinger over the head while holding the ratchet. He explained why the injury was to the back of Brentlinger's head by saying that Brentlinger's head had been bent forward when he struck him. The fight lasted less than a minute before Lumley was able to get the ratchet away from both of them. Ulmer claimed that he had had bruises in two places where Brentlinger had punched him.

Lumley testified that he hadn't been in the room when the confrontation began and said he hadn't seen Ulmer hit Brentlinger. He said that he had gone into the kitchen after

5

hearing shuffling and had then seen Brentlinger all bloody. At the time of the incident, Lumley was recovering from open-heart surgery and had difficulty recalling at trial what had happened or what he had told police.

Mark Wardlow testified that he hadn't seen Ulmer hit Brentlinger on the back of head but said he had seen them fighting—pushing and shoving one another. He also testified that he had heard Ulmer say that Brentlinger had just come there to make trouble and had heard him repeatedly ask Brentlinger to leave. The police officer who responded to the scene testified that Brentlinger had told him that he and Ulmer had gotten into a physical confrontation in the kitchen.

Brentlinger received both staples and stitches in his head, lost two of his front teeth, and suffered other cuts and bruising to his face, hands, and arms. He also estimated that Ulmer had caused over $1,000 in damage to the windshield of the Jeep.

The State charged Ulmer with criminal damage to property and the most severe form of aggravated battery, knowingly causing great bodily harm or disfigurement to another person. See K.S.A. 2015 Supp. 21-5413(b) and (g)(2) (providing the various forms of aggravated battery); K.S.A. 2015 Supp. 21-5813(a)(1) and (c). After a 2-day trial, a jury convicted Ulmer of both charges.

The district court sentenced Ulmer to 162 months in prison for the aggravated-battery conviction and 6 months in jail for the criminal-damage-to-property conviction. The court ran the two sentences concurrently, or at the same time, so that the controlling overall sentence is 162 months.

Ulmer has appealed to our court. In the next section, we will review each of the arguments he has raised on appeal (though in a different order than presented in his appellate brief).

6

ANALYSIS

I. *The District Court Did Not Err by Failing to Instruct on Self-Defense.*

Ulmer contends that the district court should have instructed the jury that he had a right to defend himself and that it could acquit him based on this defense. The State argues that the district court properly refused to give the instruction because it wasn't warranted by the evidence.

The Kansas Supreme Court has broken down the process for considering challenges to jury instruction into four steps. First, we consider whether the question was preserved in the district court. Second, we look to see whether the instruction was legally appropriate. Third, we determine whether there was sufficient evidence, looking at the evidence in the light most favorable to the defendant, to give the instruction. Fourth, if we find an error, we must determine whether it was harmless. *State v. Salary*, 301 Kan. 586, Syl. ¶ 1, 343 P.3d 1165. A defendant is entitled to an instruction on his or her theory of defense if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. *State v. McCullough*, 293 Kan. 970, 974, 270 P.3d 1142 (2012).

We find that the issue was sufficiently raised before the district court. While our record doesn't contain all of the proposed instructions, the transcript of the jury-instruction conference shows that Ulmer had requested a self-defense instruction. His attorney said that he had "request[ed] the Court to consider self-defense," but the court had determined "based on [Ulmer's] testimony, that it was a mutual combat situation and that self-defense would not be instructed upon." The State responded at the conference on the merits of the issue, suggesting that the instruction not be given because Ulmer had initiated the physical confrontation.

7

Both parties agree that a self-defense instruction can be legally appropriate on an aggravated-battery charge. So the key question is whether, under the evidence presented to the jury, there was sufficient evidence to support giving that instruction.

We find that there was not. To analyze that question, though, we must first review the basic law regarding self-defense.

K.S.A. 2015 Supp. 21-5222(a) provides that a person is justified in using force against another "when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." A legally sufficient claim of self-defense requires satisfying both a subjective and objective test: The defendant must subjectively believe that the use of unlawful force is imminent and that using force in response is necessary, and an objective reasonable person would have come to the same conclusions. *State v. Andrew*, 301 Kan. 36, 45, 340 P.3d 476 (2014). Stated another way, to establish that using force was necessary, the defendant must show that he or she sincerely and honestly believed that using force was necessary to defend himself or herself and that a reasonable person in the defendant's circumstances would have believed the same. *Salary*, 301 Kan. at 593-94; *State v. Bellinger*, 47 Kan. App. 2d 776, Syl. ¶ 4, 278 P.3d 975 (2012); *State v. Smith*, No. 112,728, 2016 WL 3365747, at *4 (Kan. App. 2016) (unpublished opinion).

There's another rule that applies if the person seeking to claim self-defense was the person who started the physical confrontation. Under K.S.A. 2015 Supp. 21-5226(c), a person cannot be legally justified in using force when that person initially provokes the use of force by the other unless (1) the person reasonably believes that he or she is in imminent danger of death or great bodily harm and has exhausted reasonable means to escape such danger, or (2) in good faith, the person withdraws from the physical contact

8

with the assailant and clearly indicates that he or she wants to withdraw and terminate the use of force.

The district court found that the evidence didn't support a self-defense instruction, concluding that "there was no imminent use of deadly force or great bodily harm by the victim" and "that this was a mutual fight."

We agree that the evidence didn't support the instruction. Even viewing the evidence in the light most favorable to Ulmer, Ulmer initially grabbed Brentlinger by the arm and started ushering him to the door. Ulmer was the first to create physical contact, thus provoking a physical confrontation; that makes K.S.A. 2015 Supp. 21-5226 applicable. Neither of the exceptions found in that statute—(1) reasonable belief that the person is in imminent danger of death or great bodily harm after having exhausted reasonable means to escape or (2) having withdrawn from physical contact and quit using force—apply here. Further, the district court concluded that the facts established that this incident was a "mutual fight," which is supported by Ulmer's version of events. Mutual combatants generally cannot claim self-defense. *Caton*, 2014 WL 6777415, at *2 (citing cases). The district court did not err in refusing to give a self-defense instruction.

II. *The District Court Did Not Err by Failing to Instruct on Defense of a Dwelling.*

Ulmer also contends that the district court should have instructed the jury that he had a right to defend his dwelling and that it could acquit him based on that defense. The State again argues that the district court properly refused to give the instruction because it wasn't warranted by the evidence. The State also argues that the defendant didn't properly preserve this objection in the trial court, in which case we would reverse the district court only under the more stringent "clear error" test.

Our record isn't complete regarding the defendant's proposed jury instructions, which aren't in the record on appeal. It does appear, though, that the defense had requested a defense-of-a-dwelling instruction because the State, at the instruction conference, told the court that instructions on "self-defense *or defense of property* should not be given" because Ulmer had initiated the physical confrontation. (Emphasis added.) The district court then ruled on the issue, concluding that a defense-of-a-dwelling instruction was not appropriate because Brentlinger had entered the premises with the homeowner's permission, not unlawfully. Although the issue is perhaps debatable, we will presume for the purposes of our opinion that the defendant did properly preserve his objection to the court's failure to include a defense-of-a-dwelling instruction.

Both parties again agree that a defense-of-a-dwelling instruction can be legally appropriate on an aggravated-battery charge. So we again turn to the question of whether, under the evidence presented to the jury, there was sufficient evidence to support giving that instruction.

We again find that there was not, a conclusion that becomes clear only after we first review the law regarding defense of a dwelling.

Under Kansas law, a person may be legally justified in using force to defend his or her dwelling in some circumstances, and so, in some cases, defense of a dwelling can be a complete defense to battery charges:

> "A person is justified in the use of force against another when and to the extent that it appears to such person and such person reasonably believes that such use of force is necessary to prevent or terminate such other's unlawful entry into or attack upon such person's dwelling, place of work or occupied vehicle." K.S.A. 2015 Supp. 21-5223(a).

See also K.S.A. 2015 Supp. 21-5231(a) (providing that a person who was legally justified in using force cannot be charged or prosecuted). In this context, "use of force" means

10

using words or actions that threaten to cause death or great bodily harm to a person, presenting or displaying the means of force, or using physical force that is not likely to cause death or great bodily harm. K.S.A. 2015 Supp. 21-5221(a)(1) and (2) (defining "use of force" and "use of deadly force").

To establish that the use of force was legally justified, the party claiming the defense must pass both a subjective and an objective test. So the defendant must show that he or she believed that the person upon whom force was used posed a threat to the defendant or the defendant's dwelling and that a reasonable person in the same circumstances would have believed that using force was necessary. See *McCracken v. Kohl*, 286 Kan. 1114, Syl. ¶ 3, 191 P.3d 313 (2008); *Bellinger*, 47 Kan. App. 2d 776, Syl. ¶ 4. (We should note that a defendant must meet an even higher standard to justify using deadly force. K.S.A. 2015 Supp. 21-5223[b]. For the purposes of this decision, where we must take the evidence in the light most favorable to Ulmer, we will assume that he used less than deadly force even though he hit Brentlinger in the head with a metal ratchet.)

When we look at the requirements of K.S.A. 2015 Supp. 21-5223(a), it's apparent that its terms are not met here. Brentlinger didn't enter the premises unlawfully. Nor did he attack the premises or initiate physical contact with anyone before Ulmer grabbed Brentlinger.

Ulmer tries to get around this straightforward reading of the statute by arguing that he was entitled to a defense-of-a-dwelling instruction because a person is justified in using force to prevent someone from *unlawfully remaining* in his or her dwelling. In essence, Ulmer contends that even if Brentlinger had lawfully entered the house with Lumley's permission, Ulmer was justified in using force after he told Brentlinger to leave and Brentlinger refused to do so.

11

Ulmer's position is contrary to the plain wording of the statute. In support of his argument, he quotes from *State v. Cole*, No. 90,047, 2003 WL 22990196, at *2 (Kan. App. 2003) (unpublished opinion) (citing PIK Crim. 3d 54.18): "A person is justified in the use of force to the extent it appears to the person, and the person reasonably believes, that such conduct is necessary to prevent another from unlawfully entering into or remaining in that person's dwelling."

Of course, an unpublished opinion from our court does not change the meaning of K.S.A. 2015 Supp. 21-5223(a); we cannot insert words into it that are not readily found there. But the actual facts and holding of *Cole* do not support Ulmer's argument anyway.

In *Cole*, the defendant had pushed a police officer who was attempting to serve a valid arrest warrant on the owner of the residence and was charged with battery against a police officer. The defendant requested a defense-of-property instruction, but the district court denied his request in part because the officer's entry was lawful. In affirming the district court's conclusion, a panel of this court noted that K.S.A. 21-3212, the previous version of the defense-of-a-dwelling statute, "expressly applies only to an 'unlawful entry,'" and the officers had lawfully entered the residence. 2003 WL 22990196, at *2. The panel also affirmed the district court's refusal to give the instruction because Cole's own testimony proved he was not "'defending his dwelling'" at the time he pushed the officer. 2003 WL 22990196, at *2. So the actual ruling in *Cole* is not in any way contrary to the plain meaning of the statute.

More recently, in *State v. Williams*, No. 107,366, 2014 WL 274455 (Kan. App. 2014) (unpublished opinion), our court addressed a similar issue to the one now before us. In *Williams*, the defendant claimed that he was entitled to a defense-of-a-dwelling instruction after his attempts to remove his stepson from his house resulted in a fight that ended with the stepson's death. The defendant argued that the district court erred in

12

concluding that defense of a dwelling was not applicable because the stepson had lawfully entered the house.

Our court affirmed the district court's decision to deny the request for the instruction. First, we held that there was insufficient evidence—even when viewed in the light most favorable to the defendant—from which a rational factfinder could have concluded that the stepson's entry into the house was unlawful, noting in particular that the stepson kept clothes at the house, had never been banned from the house or told by the defendant that he was not welcome, and had been invited inside by a temporary resident of the house on the night he died. 2014 WL 274455, at *8. Second, we rejected Williams' argument that even if his stepson had lawfully entered, the lawful entry was converted into an unlawful entry when Williams told his stepson to leave and his stepson refused and threatened him. 2014 WL 274455, at *8. Our court focused on the plain language of the defense-of-a-dwelling statute, which applies only "to efforts of a defendant to prevent or terminate an *unlawful entry* into or attack upon a dwelling." 2014 WL 274455, at *8. We concluded that "[b]y [the statute's] very terms, then, a defendant may not assert justification under the Kansas defense of a dwelling statute where the victim enters upon the premises lawfully but subsequently engaged in unlawful conduct for which the occupant of the dwelling seeks to expel the victim." 2014 WL 274455, at *8.

Ulmer's argument that he was entitled to a defense-of-a-dwelling instruction because Brentlinger was "unlawfully remaining" within his dwelling is not supported by the law. To the extent that this issue requires this court to interpret the defense-of-a-dwelling statute, we review the issue independently, with no required deference to the district court's conclusion. *State v. McCormick*, 305 Kan. 43, 378 P.3d 543, 547 (2016). The defense-of-a-dwelling statute expressly provides that a person is only justified in using force "to prevent or terminate such other's *unlawful entry* into or attack upon such person's dwelling." (Emphasis added.) K.S.A. 2015 Supp. 21-5223(a). Under the statute,

13

Ulmer cannot successfully argue that Brentlinger's refusal to leave after having lawfully entered the house justified using force to remove him. See *Williams*, 2014 WL 274455, at *8. Because a defense-of-a-dwelling instruction did not apply to the facts of this case, the district court did not err in failing to give that instruction to the jury.

### III. *If the District Court Erred by Not Acting to Prevent Prosecutorial Error, the Error Was Harmless.*

Ulmer argues that the prosecutor made statements going beyond the evidence in closing argument. Specifically, when discussing the photos of the victim's injuries that had been admitted, the prosecutor argued that the angle of the wounds was more consistent with Brentlinger's testimony (that he was struck from behind while standing) than Ulmer's (that he struck Brentlinger after Brentlinger lowered his head during their struggle):

> "I'd also like to talk to you about the consistency of testimony with the actual physical evidence that we saw. The defendant says that it wasn't until they were already fighting, engaged in a fight, that he had a right overhand. Right? That's what he said. If he had a right overhand, wouldn't you expect there to be a different angle on that cut? Go back and look at all those photos. The cut is more consistent with the way [Brentlinger] explained this happening. He's got his back to him. The defendant comes up with a pipe and whacks him over the back of the head, and there is a line right there on the top. The defendant's testimony is not consistent with the physical evidence."

Ulmer argues that such a conclusion could only be made by an expert witness and that the State didn't present an expert on this point. The State contends that the remark was a proper comment on the evidence and that, even if it was improper, any error was harmless.

14

The parties argue their claims under the framework of *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), but the Kansas Supreme Court recently adopted a new approach for considering prosecutorial error in *State v. Kleypas*, 305 Kan. 224, 382 P.3d 373, 435-36 (2016). In both frameworks, the court first looks to see whether the prosecutor went beyond allowable limits and, if so, then considers whether that error prejudiced the defendant.

We have some difficulty in this case at the first step of the analysis because the photos that the prosecutor was discussing have not been included in the appellate record. Without them, it's hard to tell whether the prosecutor went beyond what a layperson might be able to conclude from looking at them. We will assume, however, that the prosecutor went too far in his argument because it is clear to us that any error did not prejudice the defendant in this case.

Two key facts in this case are absolutely undisputed, even by Ulmer: Ulmer hit Brentlinger on the head with a metal ratchet, and doing so caused serious injury to Brentlinger. Once the defenses Ulmer claimed (self-defense and defense of a dwelling) are ruled out, the evidence against Ulmer is simply overwhelming. The charge was aggravated battery—knowingly causing great bodily harm to Brentlinger. He admittedly struck Brentlinger on the head with a metal ratchet, causing injuries sufficient to constitute great bodily harm. If the prosecutor's argument was error, there is no reasonable possibility that the error contributed to the verdict in light of the entire record. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011).

IV. *If the District Court Erred in Admitting Evidence of a Prior Crime, the Error Was Harmless.*

Ulmer also claims that the district court should not have allowed the jury to hear evidence that he had told Moore that he would hit Brentlinger "upside the head" if

Brentlinger talked to him in a disrespectful manner again. Ulmer argues that this constituted a criminal threat under K.S.A. 2015 Supp. 21-5415(a)(1). He then points to K.S.A. 2015 Supp. 60-455, which provides that evidence of past crimes is generally inadmissible, though it can be used to prove motive, intent, plan, or absence of mistake if the State notifies the defendant before trial and the court gives the jury an instruction that the evidence may only be considered for that limited purpose.

At trial, the district court agreed that the statement "could constitute an act of criminal threat" but ultimately concluded it was relevant to Ulmer's intent in striking Brentlinger and so should be allowed as evidence. The court gave the jury a limiting instruction that it could only be considered with regard to Ulmer's intent.

Ulmer complains about this issue on appeal in part because the State didn't notify him 10 days before trial that it would use the evidence, as required by K.S.A. 2015 Supp. 60-455(e). The State argues on appeal that K.S.A. 2015 Supp. 60-455 doesn't apply at all because the statement didn't rise to the level of a criminal threat. Even if it did, the State contends that any error was harmless.

As with the claim of prosecutorial error, even if we assume that it was error to admit this evidence, the error was harmless. Ulmer admitted to hitting Brentlinger on the back of the head with a metal ratchet. Ulmer argues that the alleged threat "showed an intent otherwise missing from the State's case," but the jury heard extensive evidence of the tension between Ulmer and Brentlinger before the November 2 incident. And Ulmer testified that he had said Brentlinger was only there to make trouble on the night of the fight. A reasonable jury could infer Ulmer's intent from that evidence. See *State v. Kettler*, 299 Kan. 448, Syl. ¶ 4, 325 P.3d 1075 (2014) (holding that intent may be inferred from the circumstances of the case, providing the inferences are reasonable). All the jury had to find was that Ulmer acted "knowingly," K.S.A. 2015 Supp. 21-5413(b)(1)(A), meaning that Ulmer acted with an awareness that his conduct (hitting Brentlinger with a

16

metal ratchet) was reasonably certain to bring about the result (great bodily injury). See K.S.A. 2015 Supp. 21-5202(i). Again, Ulmer admitted striking Brentlinger in the head with the ratchet, and Ulmer has not challenged on appeal the jury's finding that Brentlinger sustained great bodily injury. Based on our review of the entire record, there is no reasonable probability that the admission of Ulmer's alleged threat, even if in error, affected the trial's outcome.

V. *The District Court Did Not Err by Instructing the Jury That Its Verdict Must Be Based upon the Evidence Admitted and the Legal Instructions Provided by the Court.*

Ulmer also objects to one other jury instruction—a standard instruction to the jury that its "verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." See PIK Crim. 4th 68.010. Ulmer complains that this instruction precludes the possibility of jury nullification—the power of the jury "to disregard the rules of law and evidence in order to acquit the defendant based on the jurors' sympathies, notions of right and wrong, or a desire to send a message on some social issue." *State v. Allen*, 52 Kan. App. 2d 729, Syl. ¶ 4, 372 P.3d 432 (2016), *petition for rev. filed* June 6, 2016.

Although a jury in a criminal case *may* disregard the rules of law and the evidence to acquit a defendant, the proper duty of a jury is to accept the rules of law given to it as instructions, apply those rules to determine what facts are proven, and render a verdict based on those considerations. *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973). For those reasons, criminal defendants are not entitled to have the jury explicitly instructed on its inherent power of nullification. *State v. Naputi*, 293 Kan. 55, 66, 260 P.3d 86 (2011). But jury instructions *cannot forbid* a jury from exercising its inherent power of nullification. See *State v. Smith-Parker*, 301 Kan. 132, 163-64, 340 P.3d 485 (2014) (concluding that instructing the jury that it must or will enter a verdict of guilty if it has no reasonable doubt that the State has proven the charges was error).

17

Accordingly, several panels of this court have rejected identical arguments that the instruction at issue precludes the possibility of jury nullification. See, *e.g.*, *State v. Moss*, No. 113,034, 2016 WL 3856824, at *16-17 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* August 12, 2016; *State v. Price*, No. 112,405, 2015 WL 5311353, at *1-2 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. 1021 (2016); *State v. Cash*, No. 111,876, 2015 WL 5009649, at *3-4 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016); *State v. Boone*, No. 110,836, 2015 WL 3632046, at *3-5 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016); *State v. Amack*, No. 111,136, 2015 WL 2342371, at *4-5 (Kan. App.) (unpublished opinion), *rev. denied* 302 Kan. 1012 (2015). We agree and find no error in the district court's use of this pattern jury instruction.

VI. *Cumulative Error Does Not Require Reversal Here.*

Ulmer's final argument is that even if no individual error mandates reversal, we still should reverse his convictions based on the cumulative effect of all errors made. He's right that cumulative error may require reversal even when no error alone would. To be such a case, we must find that the cumulative effect of all the errors substantially prejudiced the defendant and denied him or her a fair trial. *State v. Fisher*, 304 Kan. 242, 263, 373 P.3d 781 (2016).

Here, there are at most two errors: (1) the district court admitting evidence that Ulmer allegedly threatened Brentlinger without following the procedural requirements of K.S.A. 2015 Supp. 60-455 and (2) the prosecutor's remarks in closing argument about the angle of the cuts on Brentlinger's head. The errors are not directly related, and the evidence against Ulmer was simply overwhelming, as we have previously discussed. The cumulative-error rule does not require reversal here.

18

We affirm the district court's judgment.