NOT DESIGNATED FOR PUBLICATION

No. 127,433

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KENNEY THOMAS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER MAGANA, judge. Oral argument held February 10, 2026. Opinion filed April 24, 2026. Affirmed.

*David L. Miller*, of The Law Office of David L. Miller, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., CLINE, J., and CAREY L. HIPP, District Judge, assigned.

CLINE, J.: Kenney Thomas appeals his convictions for aggravated battery after he shot two trespassers who were "urban exploring" on his abandoned commercial property. He claims that he acted in self-defense and that the district court erred in denying his motion to dismiss the charges on that basis. He also claims the court incorrectly instructed the jury and improperly responded to a jury question. Last, he seeks to overturn his convictions based on his counsel's ineffective assistance at trial and cumulative error.

1

After reviewing the record, we are unpersuaded by his claims. We therefore affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Thomas owned a now defunct business known as TreatCo, which operated on a 60-acre industrial park in Wichita. There are 19 buildings on the property. At one time, TreatCo made dog treats out of pig ears and cow bones. But in 2011 one of its ovens caught fire, putting TreatCo out of business. After the fire, Thomas continued to use some of the TreatCo buildings and parking lots for storage.

Since the fire, people have been coming onto the property, without permission, trying to remove copper and other metals to sell, or to graffiti or otherwise vandalize the property. Others have entered the buildings for "urban exploration," also called "urbex." Urbex involves exploring or investigating abandoned structures in urban areas, either to photograph the structures or for "the adrenaline rush and the excitement of trespassing into forbidden spaces." Tourist Secrets, www.touristsecrets.com/travel-guide/adventure/what-is-urban-exploration/.

On April 2, 2021, around 9:30 p.m., officers from the Wichita Police Department were dispatched to the TreatCo property. Thomas had called 911 to report that he had a man in custody whom he had discovered on his property. When the officers arrived, Thomas was standing next to a handcuffed man in his twenties, who was kneeling on the ground. The man had a tripod camera with him and explained that he was visiting Wichita and was on the TreatCo property for urban exploration.

Thomas was wearing a bulletproof vest over a stab proof vest, with a handgun "perched . . . in the center of his chest," which one of the officers found unusual. The officer described Thomas' demeanor during their encounter as "very nonchalant" and

2

"relaxed." He said Thomas found the situation funny and did not seem very concerned. Thomas told the officer that trespassers were a common occurrence on the TreatCo property. He explained that he set up an air cannon and sensor to alert him when "he had customers waiting for him inside."

When the officer asked Thomas about the handcuffed man, Thomas said, "'[H]e was real nice. Didn't have to shoot him. Didn't have to do shit.'" Thomas also said he had seen two other people around his property that night. He told the officer, "'I'll go get my shotgun, round you up two more'" and instructed the officer to "'[l]et the hospitals know you'll have two more with buckshot tonight.'" The officer told Thomas, "Please don't shoot anybody Ken, I would like to not have to deal with that." This interaction was recorded on the officers' body cameras.

Later that night, Kody Hoskinson, age 19, and his friend, who we call Ben, age 17, were out exploring by the TreatCo facility. They were both unarmed. They looked for a way into TreatCo, eventually discovering a hole in a fence large enough to walk through.

Kody said they took a few steps in through the fence and then heard a loud bang, which confused him. He did not realize he was shot at first. Kody saw Thomas down on one knee, so he yelled, "'Friendly, don't shoot.'" Kody then ran in the opposite direction, through a field, and heard another gunshot. Ben turned around and ran once the shots were fired. They both eventually fled to a gas station across the street, where Kody called 911.

Kody was shot in the leg, arm, and hand, and Ben suffered multiple gunshot wounds to his leg, hand, arm, wrist, and buttocks. The medical diagrams of their injuries showed the men were shot both in the front and from behind.

When officers responded to the shooting, they discovered Thomas waiting at the gate to the TreatCo facility. Thomas told them that there had been two trespassers on his property. He said he fired at them with his shotgun because they had their hands in their pockets. When Thomas took the officers to the spot where he encountered the men, the officers recovered six shotgun hulls.

The State charged Thomas with two counts of aggravated battery for shooting Kody and Ben. At one point, Thomas moved for statutory immunity, claiming he acted in self-defense. Thomas contended that when he encountered the men, he told them to stop and put their hands up. He said they did not follow his request but began reaching into their pockets instead. He claimed he fired at them because "he thought they had a weapon and he was scared."

After a hearing, the district court ultimately denied Thomas' motion. When explaining its ruling, the court first found that the presumption in K.S.A. 21-5224(a) did not apply. This statute states, in pertinent part, that a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm if the person against whom the force is used is unlawfully entering, has unlawfully entered, or is present within the place of work of the person using force. The court recounted how the TreatCo property was no longer being used for manufacturing and, other than the buildings used for storage, most of the buildings on the property were abandoned. It acknowledged that, at one point, Thomas testified he was looking at fixing up the 60-acre facility for federal tax credits. And at another point he testified to spending between 20 and 40 hours a week on the property for upkeep and repairs. Even so, it had been more than 10 years since the plant was in operation. In the end, the district court found TreatCo did not qualify as a "place of work" as contemplated by K.S.A. 21-5224(a). The court alternatively found that even if the statutory presumption did apply, the State had rebutted the presumption by showing Thomas' actions were unjustified.

4

The case proceeded to trial, after which the jury convicted Thomas of both counts of aggravated battery. The district court sentenced Thomas to 24 months in prison but suspended his sentence and granted him probation.

REVIEW OF THOMAS' APPELLATE CHALLENGES

*The district court did not commit reversible error in denying Thomas' pretrial motion to dismiss based on statutory immunity.*

Thomas first argues that the district court committed reversible error in denying his pretrial motion to dismiss because he was statutorily immune from prosecution. He claims the district court erred in finding TreatCo was not his place of work and, in alternatively finding that, even if the presumption in K.S.A. 21-5224(a) applied, the State rebutted that presumption.

*Standard of Review and Relevant Legal Framework*

To overcome a defendant's immunity claim under K.S.A. 21-5231, the State must establish probable cause that an ordinarily prudent and cautious person could reasonably believe the defendant's use of force was not justified under either or both of two scenarios: (1) the defendant did not honestly believe the use of force was necessary under the circumstances, or (2) a reasonable person would not believe the use of force was necessary under the circumstances. *State v. Thomas*, 311 Kan. 403, Syl. ¶ 6, 462 P.3d 149 (2020).

In reviewing a district court's ruling on a motion to dismiss based on immunity under K.S.A. 21-5231, the appellate court applies a bifurcated standard of review of the district court's probable cause determination. Accordingly, when the district court's factual findings arise out of disputed evidence, the appellate court must determine, without reweighing the evidence, whether the findings are supported by substantial

5

competent evidence. The ultimate legal conclusion of whether the facts found arise to the level of probable cause is reviewed de novo. *State v. Collins*, 311 Kan. 418, 427, 461 P.3d 828 (2020).

To the extent we must interpret K.S.A. 21-5224(a), statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

*TreatCo was not Thomas' "place of work" on the night of the shootings as contemplated by K.S.A. 21-5224(a).*

Under K.S.A. 21-5231, a defendant may move for immunity from prosecution in situations where the defendant's use of force was justified. Relevant here, it states:

> "(a) A person who uses force which, subject to the provisions of K.S.A. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.
> . . . .
> "(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause." K.S.A. 21-5231.

In conjunction with K.S.A. 21-5231, a person is justified using force under K.S.A. 21-5222, which provides in part:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of

6

force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

And K.S.A. 21-5224(a) details situations where the use of force is presumptively justified:

"(a) For the purposes of K.S.A. 21-3211 and 21-3212, prior to their repeal, or K.S.A. 21-5222 and 21-5223, and amendments thereto, a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to such person or another person if:

(1) The person against whom the force is used, at the time the force is used:

(A) Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force; or

(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force; and

(2) the person using force knows or has reason to believe that any of the conditions set forth in paragraph (1) is occurring or has occurred."

Taken together, Thomas would be presumed to have a reasonable belief that his use of deadly force against Kody and Ben was necessary to prevent his imminent death or great bodily harm if the TreatCo property was his place of work. K.S.A. 21-5224(a). Unless the State rebutted that presumption, Thomas would be immune from prosecution since his actions would have been statutorily justified. K.S.A. 21-5231; K.S.A. 21-5222(b). We therefore must determine the meaning of "place of work" in K.S.A. 21-5224(a) to answer whether Thomas was entitled to the statutory presumption.

When interpreting K.S.A. 21-5224(a)—as with any statute—we are tasked with ascertaining the Legislature's intent in enacting the statute. *State v. Henning*, 289 Kan. 136, 139, 209 P.3d 711 (2009). Since the best evidence is the language chosen by the Legislature to express its intent, we start there, giving common words their ordinary meaning. If the statute's language is not self-explanatory, we then turn to outside sources to clarify the meaning of the text such as the legislative history of the statute and "canons of construction." *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021). Canons of construction are a set of default assumptions courts make about how the Legislature expresses statutory meaning. These canons—some of which have historic Latin names—assume the way the Legislature uses language, grammar, punctuation, and sentence structure in drafting statutes is purposeful. See Brannon, *Canons of Construction: A Brief Overview*, Congressional Research Service (May 9, 2025).

The meaning of the phrase "place of work" is not self-evident when reading K.S.A. 21-5224(a). So, we turn to K.S.A. 21-5224(a)'s legislative history.

In 2010, the Legislature adopted K.S.A. 2010 Supp. 21-3212a, which was later recodified as K.S.A. 21-5224. L. 2010, ch. 124, § 3. But the legislative materials on the statute's adoption mainly addresses how the motivating factor for the statute's adoption was a Supreme Court opinion, *State v. Hendrix*, 289 Kan. 859, 218 P.3d 40 (2009), interpreting what it meant to use force in self-defense and addressing the use of force requirement for self-defense situations. Minutes of the House Judiciary Committee, February 1, 2010. The Legislature's goal, as they put it, was to respond to the Kansas Supreme Court's rationale in *Hendrix* that the phrase "use of force" does not include threats or displays of force, but only actual physical force. Minutes of the House Judiciary Committee, February 1, 2010. The legislative history does not discuss the meaning behind codifying locations where the use of force would be presumably justified. Nor does it explain the Legislature's intent behind using the phrase "place of work." Minutes of the House Judiciary Committee, February 15, 2010.

8

Given that the legislative history is not enlightening, we must resort to canons of statutory construction. One of these—known as *noscitur a sociis* ("it is known by its associates," Black's Law Dictionary 1271 [12th ed. 2024])—suggests that words of uncertain meaning in a statute may be given clarity by surrounding terms or phrases. *In re Wrongful Conviction of Spangler*, 318 Kan. 697, 707, 547 P.3d 516 (2024). It recognizes that "[w]hen taken in context, a word may have a broader or narrower meaning than it might have if used alone." *Jones v. Kansas State University*, 279 Kan. 128, 150, 106 P.3d 10 (2005).

The district court seemed to apply this canon when it interpreted K.S.A. 21-5224(a). The court noted that all the locations where the statutory presumption applies are places where people have a greater expectation of protection and where they do not expect to be confronted or placed in a situation where they might have to defend themselves. By enacting the presumption, the district court determined the Legislature intended to recognize that it is generally reasonable for people who are unexpectedly confronted in these locations to assume that force (including deadly force) is necessary to protect themselves. We agree with the court's logic.

And in applying this logic, it would seem the common-sense interpretation of "place of work" is someone's workplace or place of employment. And while "place of work" is not defined in Black's Law Dictionary or Merriam-Webster, dictionaries we commonly use to interpret statutes, Black's Law does define "place of employment": "The location at which work done in connection with a business is carried out; the place where some process or operation related to the business is conducted." Black's Law Dictionary 1389 (12th ed. 2024). We see no reason to differentiate the meanings of "place of work" and "place of employment" in this context.

Thomas does not directly push back on this interpretation of the statute. Instead, he focuses his argument on trying to persuade us that TreatCo was his place of

9

employment. He relies on his alleged plain meaning of individual words in the phrase "place of work" to expand the scope of the phrase. He claims "place" "could encompass any locality (small or large) limited by boundaries." And he says "work is any physical exertion for the attainment of some object." Based on this expansive interpretation, he says TreatCo was his place of work because it contained numerous fences and he spent time repairing the property as well as performing security work there in guarding the property against trespassers.

To support this interpretation, Thomas attempts to analogize TreatCo to the locations mentioned in *State v. Bellinger*, 47 Kan. App. 2d 776, 278 P.3d 975 (2012), and *Commonwealth v. Bolkey*, No. 1324 WDA 2013, 2014 WL 10914340 (Pa. Super. 2014) (unpublished opinion). In *Bellinger*, the dissenting opinion commented that the defendant's ranch, where the physical altercation in that case occurred, might constitute a "place of work." 47 Kan. App. 2d at 788 (Atcheson, J., dissenting). Similarly, Thomas points to a statement in *Bolkey* where the Superior Court of Pennsylvania noted that a strawberry field was a "place of work," so the defendant had no duty to retreat under a Pennsylvania self-defense statute from the altercation at issue. 2014 WL 10914340, at *2, n.4. Thomas likens his "fenced in property" to these locations, meaning it was his place of work.

The State, for its part, argues Thomas' own characterization of the TreatCo property as his workplace is insufficient to meet the presumption under K.S.A. 21-5224(a). And it points out evidence which undercuts Thomas' position. For example, it notes the body camera footage showed the property was in "terrible condition," with old, dilapidated structures. It also relies on Thomas' own testimony, when he said TreatCo had not been in operation for years, and his comments to officers on the night of the incident that he did not know his plans for the property. The State claims just because Thomas chose to spend time on the TreatCo property hoping to eventually fix it does not mean that the TreatCo property was a place of work that qualifies for the presumption.

10

When we interpret statutes, we are to give common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). And we must interpret statutes in a way that is reasonable and sensible to affect the legislative design and intent of the law. *State v. Griffin*, 312 Kan. 716, 720, 479 P.3d 937 (2021). With these rules in mind, we do not believe this abandoned industrial site qualifies as a location where the Legislature intended the presumption to apply. Thomas' reliance on individual words in the phrase ignores their contextual usage and unreasonably expands the phrase, rendering it meaningless.

And while both parties emphasize different aspects of the evidence presented to the district court, we cannot reweigh that evidence on appeal. The district court acknowledged all of Thomas' claimed efforts on the TreatCo property when explaining its decision yet still found TreatCo was not a "regular place of work as contemplated by the statute." In doing so, the court inherently made credibility findings about Thomas' testimony and the type of work being performed at TreatCo, which we cannot reassess on appeal.

The court's factual findings are supported by substantial competent evidence, and we agree with its conclusion that TreatCo was not Thomas' place of work for the purposes of the presumption. Even though Thomas performed some repair and security work at TreatCo, these efforts did not transform TreatCo into what one would normally consider a job or workplace, where one would have a greater expectation of protection and would not expect to have to defend themselves, like in one's home or car. We see no error in its denial of Thomas' motion on this basis.

*Even if the district court erred by finding Thomas was not in a "place of work," the State rebutted the presumption that Thomas was justified in using deadly force.*

The district court alternatively found that, even if Thomas was entitled to the statutory presumption because TreatCo was his place of work, the State rebutted the presumption that Thomas' actions were justified. After recounting the evidence in detail, the district court concluded the facts did not support a reasonable belief that Thomas' use of force was necessary to defend himself from the imminent use of unlawful force or to prevent imminent death or great bodily harm.

In explaining its decision, the district court acknowledged that, while Thomas testified that he thought one or both individuals might have been armed with a weapon, there was no evidence that Kody or Ben had any weapons. Thomas, on the other hand, was armed with a shotgun, a handgun, and a pocketknife and was wearing two tactical or bulletproof vests when he spoke to police earlier in the evening. Additionally, the district court looked at the Axon body camera footage and considered Thomas' comments to the police officers where he jokingly referred to shooting some more trespassers with buckshot.

Rather than an unexpected situation, the district court noted Thomas told police trespassers were a common occurrence on his property and he had a protocol for addressing the problem. Indeed, earlier that evening Thomas had already apprehended one trespasser, and he anticipated using his shotgun to possibly shoot others later that night.

The district court also considered Thomas' testimony that he had been watching Kody and Ben for approximately 20 minutes as they made their way around the TreatCo property. And it noted Thomas' testimony that he did not give a warning before firing his shotgun. It acknowledged that Thomas said he felt his life was in danger and that Kody

and Ben might pull a weapon out of their pockets. But it also noted Kody's and Ben's testimony contradicted Thomas' on their interaction, and how Thomas' statements to officers earlier in the evening detracted from his claim that he was in fear when he confronted Kody and Ben.

On appeal, Thomas says the district court did not properly consider other evidence supporting his belief that he encountered a life-threatening situation with Kody and Ben. First, he contends that just because Kody and Ben were unarmed when he fired at them does not mean he did not have a reasonable belief that they were reaching for a weapon as they approached him. Next, he claims the district court overlooked the fact that Thomas' state of mind at the time was influenced, in part, by a life-threatening encounter Thomas had with a trespasser two days before this occurrence. He also notes how he testified that Kody and Ben did not stop when he ordered them to do so, but they instead reached into their pockets and continued to approach him.

Thomas also says the district court was mistaken about some of the facts it relied on. First, he says the court was mistaken that he was wearing tactical vests because Thomas testified he was not wearing his bulletproof vest when he encountered them. Next, he denied lying in wait for Kody and Ben for 20 minutes. Instead, Thomas said he and one of the officers who responded to Thomas' first trespasser encounter watched Kody and Ben for 10 to 20 minutes as they entered and walked around the TreatCo property, but Thomas lost sight of them. Thomas claims he came across Kody and Ben later, after repairing cuts in the TreatCo fence.

But, again, Thomas is asking us to reweigh the evidence presented to the district court. And the record shows there is substantial evidence to support the court's factual findings. The body camera footage when the police first arrived at the scene showed Thomas explaining to the officer how he used a bulletproof vest, and he had two tactical vests on at that time. And Thomas testified he had been watching two other trespassers,

whom he told the officers he expected to see—and shoot—later that night. Under these circumstances, it is possible the court did not believe Thomas when he said that he took off his bulletproof vest between his two trespasser encounters. And as for his belief that Kody and Ben had weapons, in the body camera footage Thomas repeatedly said that it would be a different story if the trespassers had a firearm and that the police would need to check for that, but he admitted that he did not see the trespassers carrying a weapon.

As for Thomas' dispute with the district court's comment that Thomas had been watching Kody and Ben for 20 minutes earlier that night, the court acknowledged the break between when Thomas was watching the trespassers and when he actually confronted them. When reading the court's comments in context, the court seemed to simply be making the point that given Thomas' admitted history of trespasser encounters on the property and the fact that Thomas had been watching two other trespassers on his property earlier that night, Thomas' ultimate encounter with Kody and Ben was not altogether unexpected.

Thomas also submits that the district court did not make an adequate finding under the applicable legal standard as stated in *State v. Phillips*, 312 Kan. 643, 656, 479 P.3d 176 (2021). In *Phillips*, our Supreme Court stated: "[T]he record should reflect that the district court considered the totality of the circumstances, weighed the evidence without deference to the State, and resolved conflicting evidence, in arriving at its legal conclusion regarding the probable cause determination." 312 Kan. at 658. Thomas contends the district court erred in finding the State met its probable cause burden because it acknowledged that there was conflicting evidence about the events giving rise to the use of force immunity defense which the district court did not resolve. And he highlights that, at one point, the court said Kody's and Ben's testimony "does go towards supporting the probable cause standard regarding the aggravated battery crimes having been committed," but it also said "as to the contradictions, and, again, there are a number of them, those would best be resolved at trial by the finder of fact."

14

We do not read the record the same way as Thomas does. First, we read these comments by the court as differentiating between the probable cause standard at the immunity hearing and the job of a jury to determine beyond a reasonable doubt whether Thomas was guilty of the charged crimes. Although the court acknowledged Thomas' account conflicted with the account given by Kody and Ben—and Thomas' own statements to the officers—it ultimately resolved those conflicts for the purpose of the immunity motion. The court clearly stated:

> "I am not finding that the defendant has shown that he sincerely and honestly believed it was necessary to use deadly force to defend himself or others. I'm also not finding that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as being necessary. Further, not finding that the alleged victims, based upon the evidence presented, constituted an imminent threat of death or great bodily harm to the defendant upon which the defendant could reasonably believe or rely on to use deadly force.
>
> "I am taking into account the totality of the circumstances and weighing the evidence without deference to the State. I am finding that the presumption under K.S.A. 21-5224 is not present based upon the evidence. I'm further finding that if that presumption under K.S.A. 21-5224 were found to be present, that that presumption would have been rebutted by the State based upon the evidence and the totality of the circumstances."

Thomas is essentially arguing the court had to expressly state whether it believed Thomas or Kody and Ben about what happened, which is not true. The court recounted the evidence presented, noted conflicts, and found Thomas did not meet his burden to show the statutory presumption applied and, even if it did, the State rebutted that presumption. We do not find this case like the situation our Supreme Court faced in *Phillips*.

When reviewing the record, we find substantial competent evidence supports the district court's finding that the State rebutted the presumption, even if it applied.

15

*The district court's failure to instruct the jury on the statutory presumption of K.S.A. 21-5224(a) was not clearly erroneous.*

Next Thomas argues that the district court clearly erred by not sua sponte instructing the jury on the presumption in K.S.A. 21-5224(a). Thomas incorporates his arguments on why the court should not have denied his immunity motion to argue this instruction was factually and legally appropriate, claiming this means the court should have given it.

When analyzing jury instructions, Kansas appellate courts follow a three-step process: (1) determine whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) consider the merits of the claim to determine whether error occurred below; and (3) assess whether the error requires reversal. *State v. Hollins*, 320 Kan. 240, 242, 564 P.3d 778 (2025); see also K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

Under the second step, Kansas appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. 320 Kan. at 242. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. See *State v. Mendez*, 319 Kan. 718, 727, 559 P.3d 792 (2024).

And then for the third step, "[w]hether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step." *State v. Peters*, 319 Kan. 492, 515, 555 P.3d 1134 (2024). When, as here, a party asserts an instruction

16

error for the first time on appeal, "the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous." *State v. Willis*, 319 Kan. 663, 671, 557 P.3d 424 (2024); see K.S.A. 22-3414(3). And, our Supreme Court has said:

> "For the failure to be clearly erroneous, the instruction must have been legally and factually appropriate and the court must be firmly convinced the jury would have reached a different verdict if the permissible instruction had been given. The party claiming clear error has the burden to show both error and prejudice." 319 Kan. at 671.

Thomas admits that he did not request an instruction on the statutory presumption of K.S.A. 21-5224(a). We therefore review Thomas' argument on appeal for failure to give this instruction under the clearly erroneous standard.

For the same reasons we found the district court did not err in denying Thomas' immunity motion, we find it did not err in failing to instruct the jury on the statutory presumption. As explained, the instruction was not factually appropriate because TreatCo was not Thomas' place of work. And, even if it was appropriate, we are not firmly convinced the jury would have reached a different verdict if the permissible instruction had been given. Considering Thomas' comments and demeanor in the body camera footage during his encounter with the officers after discovering the first trespasser that night, we are not persuaded a jury would have found his actions justified, even if they were presumed to be reasonable.

*The district court's failure to instruct the jury on the use of deadly force under PIK Crim. 4th 52.200 was not clearly erroneous.*

Thomas also contends the district court erred in failing to instruct the jury on the use of deadly force. Because Thomas did not request this instruction at trial either, we review it under the same standard of review as his other jury instruction claim.

Thomas' argument on this point is simply a repackaging of his argument that the jury was entitled to be instructed on the statutory presumption. He says that because the district court did not instruct on the statutory presumption, this precluded the court from instructing the jury "on the use of deadly force of necessity" because that instruction is appropriate only when the issue is the deadly use of force. He claims his shooting of Kody and Ben constituted the use of deadly force, so the jury was deprived of hearing his theory of self-defense because it did not receive these two instructions. But as already explained, even if the jury had been instructed on the use of deadly force, Thomas was still not entitled to have the jury instructed on the presumption.

As to the deadly force instruction itself, Thomas says the additional language in PIK Crim. 4th 52.200 should have been given, which would have told the jury, in essence, that a defendant is permitted to use deadly force "only when and to the extent" it appears to the defendant and the defendant reasonably believes such force is necessary to prevent death or great bodily harm from another's imminent use of force. PIK Crim. 4th 52.200 (2025 Supp.).The State responds by arguing that the instruction the jury received on self-defense placed a higher burden on the State than the instruction Thomas now requests, so Thomas cannot show clear error in failing to provide this instruction to the jury.

On the issue of self-defense, the jury was instructed:

"Defendant is permitted to use physical force against another person when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force.

"Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief. When use of force is permitted as self-defense, there is no requirement to retreat."

As the State points out, Thomas fails to explain how a deadly force instruction would have been more favorable to him than the instruction that was given. Rather than only having to show Thomas was not justified in using deadly force, under the instruction given, the State had to show no physical force whatsoever was justified. And the verdict reflects the jury's belief that Thomas was not entitled to use any physical force let alone deadly force. Given that the jury found Thomas was not entitled to use any force, we are not firmly convinced it would have found he was justified in using deadly force if this additional instructional language had been provided. We are therefore unpersuaded that the failure to provide the deadly force instruction was clear error.

*The decision not to give the jury the transcripts of Thomas' immunity hearing testimony was not clearly erroneous.*

For his next issue on appeal, Thomas argues that the district court clearly erred when it failed to provide the transcripts of his immunity hearing testimony in response to a question by the jury.

*Standard of Review and Relevant Legal Framework*

A district court's response to a mid-deliberation jury question is reviewed for abuse of discretion. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014). Judicial discretion is abused when a decision is outside the applicable legal framework, contrary to the applicable facts, or otherwise arbitrary, fanciful, or unreasonable. *In re Marriage of Kenkel*, 66 Kan. App. 2d 146, 151-52, 577 P.3d 612 (2025). In other words, a court

abuses its discretion when its decision is contrary to a decision that any other reasonable person in the same position would make. See *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

In determining whether the district court's response was a correct statement of the law, the appellate court is presented with a legal question, subject to unlimited review. But when considering whether a legally appropriate response was still arbitrary, fanciful, or unreasonable, we look at whether no reasonable person would have given the response chosen by the trial court. *Lewis*, 299 Kan. at 856; see also *State v. Wade*, 295 Kan. 916, 921-23, 287 P.3d 237 (2012) (adopting this standard when faced with the answer given and an answer that one of the parties deems would be a better answer, both of which would be legally appropriate).

When the district court gives an erroneous mid-deliberation instruction in response to a jury question, this court examines reversibility under the clear error standard if the party did not press a timely and specific objection. *Lewis*, 299 Kan. at 857 (adopting the standard set out in *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 [2012]). Again, this standard requires that we be firmly convinced the jury would have reached a different verdict had the error not occurred. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

Because Thomas did not object to the district court's response to the jury question, we examine whether the district court's response is reversible under the clear error standard.

*The district court did not abuse its discretion in responding to the jury's mid-deliberation question.*

During its cross-examination of Thomas at trial, the State used part of the transcript from the hearing on Thomas' immunity motion to impeach Thomas on points where he testified differently at trial than at the immunity hearing. For example, at trial, Thomas tried to explain away his comments to law enforcement about the hospital having "'a couple customers'" with buckshot later that night by claiming he had ADHD and he was joking. Thomas also testified that he had to keep telling Kody and Ben to stop and he had "to shoot the warning shots to get them to stop." Thomas described the scene where he encountered Kody and Ben as "pitch black" and denied that the area where he found them was an open field.

During cross-examination, the State questioned Thomas about not mentioning his ADHD before or telling the officers he had shot warning shots. It also used the transcript to point out Thomas did not mention his ADHD or the warning shots at the immunity hearing. And it pointed out Thomas testified at that hearing that he did not warn Kody and Ben before shooting. Then later in cross-examination, the State once again used this transcript to confirm Thomas' prior testimony about the lighting on his property at the time of the shooting and that he encountered Kody and Ben in an open field. But, importantly, while the State used the transcript in its cross-examination of Thomas, it did not admit any portion of the transcript as an exhibit, nor did Thomas seek to admit it.

During jury deliberations, the jury submitted a question to the district court and asked: "We would like to request access to the defendant's statements from previous interviews which were referenced yesterday during the defense's questioning from April 2022 and May 2022." The district court explained:

"Counsel was consulted about this. We discussed the answer. Based upon counsel's position, the Court's position, we cannot provide the requested statements which

21

would appear to be the defendant's testimony—the previous testimony from the defendant in April and May of 2022 from the pretrial motions, which included a *Jackson v. Denno*[, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) hearing] and the defense's immunity motion, at which Mr. Thomas testified.

"And in the course of this trial, the State provided transcripts to the defendant on the witness stand to address those previous statements. So that would appear to be what the jury is wanting access to.

"So based on that, the parties have requested that we advise the jury that they have received all the evidence in this case and to refer them to Jury Instruction No. 9, which is the, when you retire to the jury room, and contains the language that your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions.

"And we've prepared a written reply that states that."

The district court then asked whether the parties had any comments, and Thomas' counsel responded, "Defendant is fine with the Court's response." The district court then took an additional step and asked Thomas' counsel, "And for the record, you've had an opportunity to confer with him about all of this; correct?" Thomas' counsel told the district court, "We certainly have visited on this, and Mr. Thomas understands the question and approves of the response." The district court then called the presiding juror to the courtroom and read the court's response, which stated: "The jury has received all the evidence in this case. You are referred to Instruction No. 9." Jury instruction No. 9 stated, in part: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

On appeal, Thomas contends the district court erroneously responded to the jury's question because only allowing certain inculpatory portions of the transcripts to be read into the record without allowing the remainder of his testimony to be read to the jury violated the rule of completeness. He now claims the court's response was incorrect because "[t]he entirety of the Defendant's immunity hearing testimony should have been

deemed 'evidence' under the rule of completeness and should have, at a minimum, been read to the jury in open court."

The rule of completeness is a common-law rule addressing the admissibility of evidence on the basis that a party has "opened the door" to the admission of otherwise inadmissible evidence. *State v. White*, No. 102,270, 2011 WL 5389514, at *19 (Kan. App. 2011) (unpublished opinion). For example, "when the State has introduced incriminating statements made by the defendant, the defendant is allowed to introduce exculpatory statements, even though the defendant may not testify and the statements may be hearsay." 2011 WL 5389514, at *19. In *White*, the district court relied on this rule to find the defendant opened the door to a line of questioning by the State otherwise prohibited by the court's motion in limine order. 2011 WL 5389514, at *19.

The problem with Thomas' argument is he did not ask to admit any portion of the immunity hearing transcript at trial. If his attorney tried to do this or otherwise questioned Thomas about his testimony at this hearing on redirect, and the State objected, then Thomas could have relied on this rule to justify admitting the transcript. But he did not, and we fail to see how this rule applies to the situation here. Evidence had closed well before the jury began deliberating. Thomas cites no legal authority for his claim that the district court should have provided evidence that was not introduced at trial or his claim that the rule somehow transformed the transcript into admitted evidence. As such, we find the district court did not abuse its discretion in responding to the jury's question.

*Thomas' ineffective assistance of counsel claim is not properly before this court.*

Next, Thomas claims he was denied effective assistance of counsel because his attorney did not ask more questions to develop Thomas' testimony about a prior trespassing incident and in failing to object to testimony by one of the officers which Thomas claims was inadmissible opinion testimony.

23

*Standard of Review and Relevant Legal Framework*

In general, claims of ineffective assistance of counsel will not be heard for the first time on appeal. *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009). This is because the district court, who observed counsel's performance and is aware of the trial strategy employed, is in a much better position to consider the competence of counsel and should have the first opportunity to rule on the issue. *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986). As a result, when a defendant raises an ineffective assistance of counsel claim for the first time on direct appeal, appellate courts have three options: (1) Follow the general rule and refuse to address the issue, allowing the defendant to pursue relief through a K.S.A. 60-1507 motion; (2) rule on the merits in the "extremely rare" cases that there is a sufficient record to do so; or (3) remand the case for a *Van Cleave* hearing "so that facts relevant to determination of the legal issue may be developed and an evidentiary record established." *Rowland*, 289 Kan. at 1084-85; see *State v. Reed*, 302 Kan. 227, 233-34, 352 P.3d 530 (2015). Whether to remand a case for a *Van Cleave* hearing lies within the sound discretion of the appellate court. 239 Kan. at 120.

*Thomas' ineffective assistance of counsel claim should be brought first in the district court.*

Thomas submits that he was prejudiced by his trial counsel's deficient performance through his counsel's failure to introduce evidence of a prior trespassing incident, which he claims would have explained his state of mind during the shooting. He also says his attorney should have objected to testimony by one of the officers which Thomas claims was inadmissible opinion testimony on whether Thomas' use of force was reasonable.

As the State points out, Thomas fails to explain why this issue is properly before us. Thomas can pursue relief on both these claims through a K.S.A. 60-1507 motion. And

24

this case does not present an "extremely rare" circumstance where there is a sufficient record to allow us to rule on the merits. Thomas' attorney could have had a strategic reason not to ask more questions about the prior trespassing incident or object to the officer's testimony. Perhaps questioning about the prior incident would have opened the door to negative evidence Thomas' attorney wanted to keep out, or he may have felt, like the district court found, that the more trespassing incidents that were discussed, the less reasonable it was for Thomas to respond the way he did to Kody and Ben. And, as for the officer's testimony, perhaps Thomas' trial counsel did not want to draw attention to that testimony or impeach the officer's credibility, anticipating that the officer might also provide favorable testimony for Thomas. We do not know counsel's strategy, if any, for his actions. This is another reason why Thomas' claims should be handled in a postconviction relief motion—like a K.S.A. 60-1507 motion—where a district court can develop facts about counsel's strategy and context concerning these issues.

While our court sometimes remands these cases for a *Van Cleave* hearing to develop more facts on ineffective assistance of counsel claims, Thomas does not ask for this on appeal. An issue not briefed is deemed waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

Instead, Thomas asks this court to sidestep further development of his ineffective assistance of counsel claims and find based on this record that his counsel was ineffective. But, for the reasons we have explained, the record is insufficient to allow a merits decision. We therefore decline to consider his ineffective assistance of counsel claims on appeal.

*The cumulative error doctrine does not apply and, thus, Thomas was not denied his constitutional right to a fair trial.*

Finally, Thomas claims he was denied his constitutional right to a fair trial by the cumulative errors of the district court and the prejudicial errors of his trial counsel. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024). But, having found no errors, this doctrine is inapplicable here. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

Affirmed.